Richard SINCOCK et al., Plaintiffs,

v.

William DUFFY, Jr., et al., Defendants.

Civ. A. No. 2470.

United States District Court
D. Delaware.

April 17, 1963.

Vincent A. Theisen and Victor F. Battaglia, Wilmington, Del., for plaintiffs.

Januar D. Bove, Jr., Frank O'Donnell, Warren B. Burt, Wilmington, and N. Maxson Terry, James H. Hughes, III, Dover, Del., Robert W. Tunnell, Georgetown, Del., and David P. Buckson, Atty. Gen. for State of Delaware, for defendants.

Before BIGGS, Circuit Judge, and WRIGHT and LAYTON, District Judges.

BIGGS, Circuit Judge.

■ This is a Three-Judge Court constituted pursuant to Section 2284 of Title 28, U.S.C., and our jurisdiction lies in the first instance in the provisions of Sections 2281 and 1343, Title 28, U.S.C., and in Section 1983, Title 42, U.S.C.A., the Civil Rights Acts. We are called upon to restrain enforcement of a provision of the Constitution of Delaware and for other relief as set out hereinafter. Section 2281 states in pertinent part: "An interlocutory or permanent injunction restraining the enforcement, operation or execution of any State statute by restraining the action of any officer of such State in the enforcement or execution of such statute or of an order made by an administrative board or commission acting under State statutes, shall not be granted by any district court or judge thereof upon the ground of the unconstitutionality of such statute unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title." We, of course, in the case at bar are passing on provisions of the Constitution of Delaware, as hereinafter set out, and are not adjudicating the validity of a "statute". But, as the Supreme Court has stated, it would be incongruous to hold that a single judge "while prohibited from enjoining action under an act of the state legislature, would be free to act if the

state constitution alone were involved." See American Federation of Labor v. Watson, 327 U.S. 582, 592–593, 66 S.Ct. 761, 766, 90 L.Ed. 873 (1946).

Our jurisdiction over the subject matter of the instant case has been stated by us in one of our previous opinions as follows: "In Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the Supreme Court of the United States held that a court such as this had the jurisdiction to and must determine whether or not the apportioning of members of a state general assembly or legislature by geographical units offends the constitutional rights of the electors of the state under the Equal Protection Clause of the Fourteenth Amendment of the Constitution of the United States because of an alleged debasement of their voting rights." See D.C., 207 F.Supp. at p. 205.

The suit at bar is a class action brought by the plaintiffs on their own behalf and on behalf of all other persons similarly situated. Some of the prior history of this case is set out in our opinions in 207 F.Supp. 205, in 210 F.Supp. 395, and in id. 396 (sub nom. Sincock v. Terry). As will be gathered from the preceding paragraph, the fundamental issue presented for our adjudication is whether or not the apportioning of members of the General Assembly of the State of Delaware offends the electors of the State because of an alleged debasement of their voting rights. We have before us not only the provisions of Section 2 of Article II of the Constitution of Delaware of 1897 as originally framed, Del.C.Ann., but also the Amendment to Section 2 of Article II as agreed to by the 122nd General Assembly this year. See id., supra, (1962 Supp.) This is so because the new Section 2 of Article II, promulgated and effective in January 1963, is designated an "Amendment", and if it should fail for constitutional infirmities old Section 2 of Article II might conceivably be deemed to be reinstated. We shall not rule on this issue. Rather than deal with the intricacies of law relating to survival or revival of constitutional provisions, it seems simpler to adjudicate the constitutionality of both old and new Section 2 of Article II, and we shall do so.

The relief sought by the plaintiffs in substance is an adjudication that Section 2 of Article II as it was prior to the 1963 Amendment and as it is now is unconstitutional under the Equal Protection Clause of the Fourteenth Amendment of the Constitution of the United States. The plaintiffs also seek a decree of this court reapportioning the representation of both the House of Representatives and the Senate of the General Assembly of Delaware in accordance with Section 3 of Article I of the Constitution of Delaware, and have submitted a plan on which an extensive hearing was had pursuant to the pretrial order. The plaintiffs assert that this plan would, if decreed by this court, grant them and other citizens of Delaware the relief sought. The plaintiffs also desire an injunction to restrain the defendants[1] from applying the apportionment provided by the Constitution of Delaware, as it was and as it is, at the next general election or thereafter.

The case was pretried extensively. A statement of agreed facts is set out in the pretrial order. Affidavits have been filed and depositions taken. The court also has had the advantage of the evidence of three political scientists whom the court deemed to be well qualified in that field. The qualifications of these gentlemen are set out in the testimony

---

1. When we use the term "defendants" we desire to point out as we did in one of our earlier opinions in this case, sub nom. Sincock v. Terry, 210 F.Supp. at p. 399, note 1 cited to the text, that the Chancellor of Delaware and the Judges of the Superior Court of the State of Delaware, all members of the Board of Canvass, state in their answers that as judicial officers serving in ministerial capacities they deem it inappropriate to take a position on the merits of this lawsuit but aver that as Chancellor of Delaware or as Judges of the Superior Court they will continue to discharge the duties imposed upon them by the Constitution of the State of Delaware unless restrained by a lawful order of this Court. The Chancellor and the Judges have not, of course, asserted any position in respect to the matters dealt with in this opinion.

and need not be repeated here. They were Dr. Paul Dolan of the University of Delaware and Associate Professor Royce Hanson of American University, who testified on behalf of the plaintiffs, and Dr. James R. Pollock, Murfin Professor of Political Science at the University of Michigan, who gave evidence on behalf of the defendants. We also have had the benefit of the testimony of Mr. Leon de Valinger, State Archivist of Delaware, who has specialized in the history of the government of this State, and of Houston Wilson, Esquire, a member of the Delaware Bar, Chairman of a Subcommittee of the Bi-Partisan Reapportionment Committee, the parent committee appointed by the Governor of Delaware and which made a report to him.

The findings of fact made herein are, of course, based on the entire record.

I

The plaintiffs are residents of four representative districts and four senatorial districts of the State of Delaware and are duly qualified voters and taxpayers of the State and citizens of the United States. The defendants comprise the Boards of Canvass, the Clerks of Peace, the Departments of Election and their Secretaries of New Castle, Kent and Sussex Counties, respectively, and the State Election Commissioner, all of whom perform statutory and constitutional duties relating to the general elections in the State of Delaware.

The composition of the House and Senate of the General Assembly is established by the provisions of Section 2, Article II of the Constitution of the State of Delaware of 1897. This section, as it existed prior to the 1963 Amendment, divided Delaware into 35 geographical representative districts and provided that the qualified electors of each district should elect one representative. It also divided Delaware into 17 geographical senatorial districts from each of which a Senator was chosen by the qualified electors thereof. The section created 15 representative districts, numbered one to 15 inclusive, in New Castle County; 10 representative districts, numbered one to ten inclusive, in Kent County; and 10 representative districts, numbered from one to ten inclusive, in Sussex County. It also established 7 senatorial districts, numbered 1 to 7 inclusive, in New Castle County; 5 senatorial districts, numbered 1 to 5 inclusive, in Kent County; and 5 senatorial districts, numbered 1 to 5 inclusive, in Sussex County.

The apportionment of Delaware into representative and senatorial districts as designated was the result of a Constitutional Convention convened at Dover, Delaware, on December 1, 1896, for the purpose of revising the Constitution of the State of Delaware of 1831.

At the time of the adoption of the Constitution of 1897 the population of Delaware was approximately 180,000. About 105,000 persons resided in New Castle County, 70,000 of whom resided in the City of Wilmington,[2] and 35,000 resided in rural New Castle County. Kent County had a population of 32,000 and Sussex County a population of 38,000.[3]

At the time of the adoption of the Constitution of 1897 the inhabitants of rural New Castle County, Kent County, and Sussex County were considered to be

2. The official title of the City of Wilmington is "The Mayor and Council of Wilmington". We point out that the City of Wilmington is located in New Castle County and also to those readers unfamiliar with Delaware mores that that portion of New Castle County outside the boundaries of the City of Wilmington is and was referred to customarily in the record, the briefs and oral arguments in this case and in this opinion, on occasion, as "*rural* New Castle County". (Emphasis added.) The term "rural" so used does not necessarily mean the countryside for there are other municipalities or their

factual equivalents situated in New Castle County other than the City of Wilmington. "Rural New Castle County" as that word is interpreted in Delaware by Delawareans, means all that part of New Castle County which is not Wilmington.

3. See Population of Delaware, Table 1, Plaintiffs' Exhibit No. 3 to the Deposition of Doctor Paul Dolan. The reader will observe, if the bald figures set out in this paragraph are added up, there is a deficiency of about 5,000. If the official census figures be examined, however, and the Dolan Deposition be read, it will ap-

identical insofar as their occupations and vocations were concerned and the populations of the respective counties were substantially equal. Accordingly each county was apportioned to the then existing population so that each rural area had 10 representatives in the House of Representatives and 5 senators in the Senate of the General Assembly. The City of Wilmington with a population of 70,000 was accorded special consideration and was allotted 5 representatives in the House of Representatives and 2 senators in the Senate.[4]

By April 1, 1930, according to the 15th Decennial Census[5] of the United States, the population of the State of Delaware had increased to 238,380 which represented an increase of 15,374 or 6.9% as compared with the population on January 1, 1920. In 1930 New Castle County had grown to 161,032 inhabitants of which 106,597 resided in the City of Wilmington and 54,435 resided in rural New Castle County, while Kent County had a population of 31,841 and Sussex County had a population of 45,507.[6]

By 1960 the total population of Delaware had increased to 446,292 of which 307,446 resided in New Castle County. Of these, 95,827 resided in the City of Wilmington and 211,619 resided in rural New Castle County. In the same year 65,651 persons resided in Kent County and 73,195 persons inhabited Sussex County.[7] It is apparent from the foregoing that New Castle County in general and rural New Castle County in particular have grown in population out of proportion to the growths in Kent and Sussex Counties. Using the 1897 and the 1960 figures as a basis the percentagewise growth of the three Counties has been approximately as follows: In 1897 rural New Castle County had approximately 20% of the population, Kent County had approximately 18%, and Sussex County had approximately 21%. In 1960 rural New Castle County had approximately 47% of the population, Kent County had approximately 14%, and Sussex County had approximately 16%.

The apportionment of the 35 representative districts established by Section 2 of Article II of the Constitution of Delaware of 1897, as it existed prior to the 1963 Amendment, for the years 1890 through 1960, was as follows:

NEW CASTLE COUNTY

| DISTRICT | 1890 | 1900 | 1910 | 1920 | 1930 | 1940 | 1950 | 1960 |
|---|---|---|---|---|---|---|---|---|
| Wilmington | | | | | | | | |
| 1 | | | | | 11,513 | 12,202 | 11,515 | 7,814 |
| 2 | | | | | 31,299 | 35,082 | 35,762 | 33,772 |
| 3 | | | | | 21,222 | 22,843 | 41,417 | 18,359 |
| 4 | | | | | 9,352 | 9,877 | 9,078 | 5,394 |
| 5 | | | | | 31,446 | 32,440 | 32,584 | 30,488 |
| Total | 61,431 | 76,508 | 87,411 | 110,168 | 106,597 | 112,504 | 110,356 | 95,827 |

NEW CASTLE COUNTY

| DISTRICT | 1890 | 1900 | 1910 | 1920 | 1930 | 1940 | 1950 | 1960 |
|---|---|---|---|---|---|---|---|---|
| 6 | 3,994 | 3,899 | 4,440 | 6,451 | 10,917 | 14,426 | 24,039 | 58,228 |
| 7 | 6,144 | 4,736 | 6,038 | 6,293 | 14,317 | 18,696 | 32,224 | 47,509 |
| 8 | 3,786 | 3,728 | 3,886 | 4,052 | 4,453 | 5,662 | 7,677 | 23,428 |
| 9 | 2,870 | 3,061 | 3,587 | 3,921 | 5,476 | 6,398 | 9,057 | 20,040 |
| 10 | 5,980 | 5,407 | 5,406 | 6,386 | 8,261 | 10,245 | 21,824 | 40,293 |
| 11 | 2,126 | 1,999 | 1,797 | 1,692 | 1,881 | 1,970 | 2,599 | 9,325 |
| 12 | 2,216 | 2,425 | 2,693 | 2,351 | 2,635 | 2,771 | 3,053 | 3,401 |
| 13 | 4,785 | 4,455 | 4,237 | 3,596 | 3,457 | 3,685 | 4,554 | 5,218 |
| 14 | 2,336 | 2,141 | 2,257 | 2,099 | 1,939 | 2,035 | 2,175 | 2,534 |
| 15 | 1,514 | 1,338 | 1,436 | 1,225 | 1,099 | 1,170 | 1,321 | 1,643 |
| Total | | | | | 54,435 | 67,058 | 108,523 | 211,619 |
| Total NCC | 97,182 | 109,697 | 123,188 | 148,239 | 161,032 | 179,562 | 218,879 | 307,446 |

pear that the figure "180,000" represents an estimate between the figures of the 1890 Decennial Census and those of the 1900 Decennial Census.

4. See note 4 on Page 175.
5. See note 5 on Page 175.
6. See note 6 on Page 175.
7. See note 7 on Page 175.

KENT COUNTY

| DISTRICT | 1890 | 1900 | 1910 | 1920 | 1930 | 1940 | 1950 | 1960 |
|---|---|---|---|---|---|---|---|---|
| 1 | 4,372 | 4,228 | 3,627 | 3,521 | 3,229 | 3,506 | 4,422 | 6,084 |
| 2 | | | 3,046 | 2,623 | 3,133 | 3,530 | 4,248 | 17,806 |
| 3 | 2,885 | 3,144 | 3,032 | 2,831 | 2,586 | 2,527 | 2,671 | 3,361 |
| 4 | | | 2,709 | 2,439 | 2,292 | 2,502 | 2,555 | 3,716 |
| 5 | | | 3,771 | 3,927 | 4,363 | 5,169 | 6,052 | 9,125 |
| 6 | | 1,242 | 2,941 | 2,500 | 2,352 | 2,274 | 2,168 | 2,626 |
| 7 | | | 3,252 | 3,229 | 3,393 | 3,745 | 3,838 | 7,880 |
| 8 | | | 3,331 | 3,000 | 3,040 | 3,200 | 3,269 | 5,168 |
| 9 | | | 3,945 | 3,920 | 4,043 | 4,288 | 4,418 | 4,956 |
| 10 | 3,364 | 3,118 | 3,067 | 3,033 | 3,410 | 3,700 | 4,229 | 4,929 |
| Total: | | | 32,721 | 31,023 | 31,841 | 34,441 | 37,870 | 65,651 |

SUSSEX COUNTY

| DISTRICT | 1890 | 1900 | 1910 | 1920 | 1930 | 1940 | 1950 | 1960 |
|---|---|---|---|---|---|---|---|---|
| 1 | 3,913 | 4,117 | 5,060 | 5,079 | 5,276 | 5,936 | 7,254 | 9,641 |
| 2 | 2,793 | 3,456 | 5,329 | 4,589 | 4,329 | 5,315 | 5,849 | 6,439 |
| 3 | 3,223 | 3,779 | 5,174 | 5,346 | 5,182 | 6,350 | 7,815 | 9,437 |
| 4 | 3,074 | 3,132 | 3,352 | 2,761 | 2,955 | 3,448 | 4,446 | 5,318 |
| 5 | 4,511 | 5,112 | 5,980 | 6,362 | 6,319 | 6,804 | 7,139 | 8,140 |
| 6 | 3,495 | 3,575 | 4,979 | 4,513 | 4,836 | 5,779 | 6,470 | 8,010 |
| 7 | | | 4,770 | 4,016 | 4,755 | 5,415 | 6,195 | 6,623 |
| 8 | | | 1,884 | 1,821 | 1,803 | 1,864 | 2,536 | 2,957 |
| 9 | 2,436 | 2,874 | 3,028 | 3,071 | 3,062 | 3,456 | 3,563 | 4,271 |
| 10 | 2,997 | 3,959 | 6,857 | 6,183 | 6,990 | 8,135 | 10,069 | 12,359 |
| Total: | | | 46,413 | 43,741 | 45,507 | 52,502 | 61,336 | 73,195 [5] |

As a result of the change in population the representative districts range in size from 1,643 inhabitants of New Castle County's 15th Representative District of Blackbird Hundred [9] to 58,228 inhabitants of New Castle County's 6th Representative District of Brandywine Hundred. At the time of the 1962 general election a vote in the 15th Representative District was equal to one vote in the 6th Representative District of New Castle County, although the population of the latter district is approximately 35 times greater than that of the former.

We take judicial notice of the fact that in the State of Delaware, as in the other States of the United States, there is a direct and reliable relationship between the number of inhabitants in a given area and the number of electors therein and that the ratio of electors to

4. Vol. 3: Debates and Proceedings of the Constitutional Convention of the State of Delaware; pp. 2008–2112, 2029–2031.

5. 15th Decennial Census of the United States: 1930, published by the United States Department of Commerce, Bureau of the Census. The term "Decennial Census" and the term "Census" are used from time to time throughout this opinion as in the pretrial order. The reference is always to a Decennial Census as published by the Department. Plaintiffs' Exhibit No. 4 to the Deposition of Doctor Dolan.

6. 15th Decennial Census of the United States at pp. 4–5. Note 4, *supra*.

7. United States Census of Population, 1960, published by the United States Department of Commerce, Bureau of Census. Plaintiffs' Exhibit No. 2 of the Deposition of Doctor Dolan.

8. Table 5 Population of States and Territories by Minor Civil Divisions; 1890 and 1900, Delaware (Form 12 Census of the United States, Population, Volume 1); 15th Census of the United States: 1930, Population Bulletin, First series Delaware, Number and Distribution of Inhabitants; 1960 Census of Population, Number of Inhabitants, Delaware, Final Report P.C. (1)—9A—Plaintiffs' Exhibits 2, 3, 4, 5, 10, 11 and 12 of the Dolan Deposition.

9. "Hundred" is used in Delaware in the same sense, we believe, as it was originally employed in English law to signify "A division of a county, which some make to have originally consisted of 100 hides of land, others of 10 tithings or 100 free families." Bouvier's Law Dictionary, Rawle's 3rd Rev. Bouvier also states, "In Delaware the subdivisions of a county are called hundreds. They correspond to towns in New England, townships in Pennsylvania, parishes in Louisiana, and the like." See also Webster's Collegiate Dictionary.

inhabitants is relatively stable. We find, therefore, that the number of inhabitants of a given area in the State of Delaware reflects with relative accuracy the number of electors in that area, and for the purpose of adjudicating the issues in this case that it is the fact that the number of inhabitants is a relatively accurate indicator of the number of electors entitled to be represented in the General Assembly from the area given if representation is to be measured on a population-area basis. No party to this case takes a view in respect to this matter different from that which we have just expressed.

We point out that 18 representative districts with the least population and containing only approximately 18½% of the State's population may elect a majority of the members of the House of Representatives. The inhabitants of the 18 least populated representative districts are less in number than those of the two districts having the heaviest concentration of population; nonetheless, the former elect 18 representatives in the House of Representatives, while the latter elect 2 representatives in the House of Representatives of the Delaware General Assembly. The 1960 Census shows that more than one-half of the entire population of the State of Delaware, 233,718 persons, lives in six representative districts, yet the representatives of those districts have the same voting power in the General Assembly as the representatives of but 16,552 persons residing in the 6 least populous representative districts of the State of Delaware.

A similar situation existed prior to the 1963 Amendment with regard to the senatorial districts established by the Constitution of 1897 where 7 senators were apportioned to New Castle County which had a population in 1960 of 307,446 as compared with 5 senators in Kent County having a population of 65,651, and with 5 senators in Sussex County with a population of 73,195. Of the 7 senators from New Castle County, 5 represent the rural area, having a population of 211,619. The City of Wilmington with a population of 95,827 was allotted 2 senators in the General Assembly as contrasted with 5 senators each for Kent and Sussex Counties and rural New Castle County.

The 17 senatorial districts established by Section 2, Article II of the Constitution of the State of Delaware of 1897, as it existed prior to the 1963 Amendment, varied greatly in the number of inhabitants residing in them. The population of these districts from 1930 through 1960, with the percentage of change in each, was as follows:

| COUNTY | Dist. | POPULATION | | | | % CHANGE | | |
|--------|-------|------|------|------|------|---------------|---------------|---------------|
| | | 1930 | 1940 | 1950 | 1960 | 1940/1930 | 1950/1940 | 1960/1950 |
| New | 1 | 52,521 | 57,925 | 57,089 | 52,131 | +10 | —1 | —9 |
| Castle | 2 | 54,076 | 54,579 | 53,177 | 43,696 | + 1 | —3 | —18 |
| | 3 | 12,778 | 16,856 | 28,228 | 64,345 | +32 | +67 | +128 |
| | 4 | 16,909 | 21,928 | 35,712 | 64,820 | +30 | +63 | +81 |
| | 5 | 16,372 | 19,414 | 33,934 | 63,734 | +19 | +75 | +88 |
| | 6 | 5,338 | 5,655 | 7,153 | 14,543 | + 6 | +26 | +103 |
| | 7 | 3,038 | 3,205 | 3,496 | 4,177 | + 5 | + 9 | +19 |
| Kent | 1 | 6,362 | 7,036 | 8,670 | 23,890 | +11 | +23 | +176 |
| | 2 | 4,878 | 5,029 | 5,226 | 7,077 | + 3 | + 4 | +35 |
| | 3 | 7,756 | 8,914 | 9,890 | 17,005 | +15 | +11 | +72 |
| | 4 | 6,395 | 6,562 | 6,586 | 7,582 | + 3 | — | +15 |
| | 5 | 6,450 | 6,900 | 7,498 | 10,097 | + 7 | + 9 | +35 |
| Sussex | 1 | 9,605 | 11,251 | 13,103 | 16,080 | +17 | +16 | +23 |
| | 2 | 8,137 | 9,798 | 12,261 | 14,755 | +20 | +25 | +20 |
| | 3 | 11,155 | 12,583 | 13,609 | 16,150 | +13 | + 8 | +19 |
| | 4 | 6,558 | 7,279 | 8,731 | 9,580 | +11 | +20 | +10 |
| | 5 | 10,052 | 11,591 | 13,632 | 16,630 | +15 | +18 | +22 [10] |

10. Liberman and Rosbrow, "The Delaware Citizen," Welfare Council, "Population of Minor Civil Divisions (Representative Districts) in the Counties of Delaware, 1950 and 1960."

The 17 senatorial districts, as established by Section 2, Article II of the Constitution of 1897 prior to the 1963 Amendment, varied in 1960 from approximately 65,000 to approximately 3,000 inhabitants. The vote in the General Assembly of the smallest senatorial district was equal to that of the largest senatorial district which exceeded it in numbers of population by more than 21 times. The apportionment established by the Constitution with respect to the Senate permitted 22% of the voters of the State of Delaware to elect a controlling majority in the Delaware Senate.

The uneven growth of the different areas of the State created a condition because of which the numbers of inhabitants in representative and senatorial districts differed not only on an intercounty basis but also on an intracounty basis. Differences also manifested themselves in the representative districts within the City of Wilmington. For example the 4th Representative District of Wilmington, having 5,394 inhabitants, had the same representation in the House of Representatives of Delaware as the 2nd Representative District with 33,772 inhabitants and the 5th Representative District with 30,488 inhabitants.

The Amendment of Section 2 of Article II is now in effect and will remain so unless it be declared unconstitutional. Its provisions will govern the next general election in the State of Delaware. The Amendment provides in pertinent part:

"Section 1. Paragraphs 1 and 2 of Section 2 of Article II of the Constitution are hereby amended to read:

"The House of Representatives shall be composed of thirty-five members, plus such additional members as shall be provided pursuant to Section 2A of this Article, who shall be chosen for two years. The Senate shall be composed of twenty-one members, who shall be chosen for four years.

"The State is hereby divided into thirty-five Representative Districts. There shall be such additional Representative Districts as shall be provided pursuant to Section 2A of this Article. From each Representative District there shall be chosen, by the qualified electors thereof, one Representative. The State is also hereby divided into twenty-one Senatorial Districts, from each of which shall be chosen, by the qualified electors thereof, one Senator. In New Castle County there shall be seven Senatorial Districts, numbered from one to seven inclusive; in Kent County, seven Senatorial Districts, numbered from one to seven inclusive; and in Sussex County, seven Senatorial Districts from one to seven inclusive.

"Section 2. The following words are hereby added after the words: 'Number Five. The Eighth and Tenth Representative Districts', in that part of Article II, Section 2 of the Constitution dealing with the Senatorial Districts in Kent County:

"Number Six, at Large. The first, second, fifth, seventh and eighth Representative Districts.

"Number Seven, at Large. The third, fourth, sixth, ninth and tenth Representative Districts.

"Section 3. The following words are added following the words 'Number Five. The Ninth and Tenth Representative Districts', in that part of Article II, Section 2 of the Constitution dealing with the Senatorial Districts in Sussex County:

"Number Six, at Large. The first, second, third, four and fifth Representative Districts.

"Number Seven, at Large. The sixth, seventh, eighth, ninth and tenth Representative Districts.

"Section 4. The following words are added immediately following the words added by Section 3 above:

"The first Senators elected from the Sixth Senatorial Districts of Kent and Sussex Counties shall serve for a two year term only, thereafter their successors shall serve for a full four year term.

"Section 5. The following new Section 2A is added to Article II of the Constitution, immediately following Section 2:

"Section 2A. In addition to the existing 35 Representative Districts as set forth in Section 2 of this Article, there shall be additional Representative Districts as hereafter provided.

"Each existing Representative District as set forth in Section 2 of this Article, with a population residing therein in excess of 15,-000, as shown by the last official federal decennial census shall be entitled to one additional Representative for each additional 15,-000 population or major fraction thereof residing within the District.

"Upon any Representative District, as set forth in Section 2 of this Article, being entitled to more than one Representative, it shall be sub-divided into new Representative Districts for each additional Representative to which it is entitled, from which shall be chosen by the qualified electors thereof, a Representative.

"After each official federal decennial census the new Representative Districts created pursuant to this Section shall be abolished and the Representative Districts set forth in Section 2 of this Article shall again be re-divided as set forth herein.

"The sub-dividing of the Representative Districts as set forth herein shall be done by a Redistricting Commission, consisting of the Governor, as Chairman, and the State Chairman of the two political parties receiving the largest vote for Governor at the preceding election for Governor as advisors to the Governor. Redistricting and reapportioning by the Commission as set forth herein shall be accomplished in accordance with the following criteria: Each new Representative District shall, insofar as is possible, be formed of contiguous territory; shall be as nearly equal in population as possible to the other new districts being created within the existing Representative District; shall be bounded by ancient boundaries, major roads, streams, or other natural boundaries; and not be so created as to unduly favor any person or political party.

"Within 120 calendar days following the official reporting to the President of the United States of each decennial census, (or within 120 calendar days after this amendment takes effect) the Governor, on behalf of the Commission, shall file with the Secretary of State the plan for redistricting and reapportioning as provided for herein. Forthwith, after the filing, the Governor shall issue a, proclamation of redistricting and reapportioning. The Secretary of State shall cause such proclamation to be published in two newspapers of general circulation within the State for two consecutive weeks, within 20 days after the issuance of the proclamation. The proclamation shall become effective within 30 days of its issuance.

"Any qualified voter may apply to the Superior Court to compel the Governor, by mandamus or otherwise, to perform the redistricting and reapportioning duties or to correct any error in redistricting and reapportioning. Application to compel the Governor to perform the redistricting and

reapportioning duties must be filed within thirty days of the expiration of the 120 days allotted to the Commission to file its plan, if such plan is not timely filed. Application to compel correction of any error in redistricting and reapportioning must be filed within thirty days following the proclamation. Original jurisdiction in these matters is hereby vested in the Superior Court. On appeal, the cause shall be reviewed by the Supreme Court upon the law and the facts.

"Section 6. The following new Section 2B is added to Article II of the Constitution, immediately following Section 2A as enacted above.

"Section 2B. The number of delegates and the method of electing delegates to the Constitutional Convention as provided in Section 2, Article 16, shall not be effected by the addition of Representatives or Representative Districts, pursuant to Section 2A of this Article. The Representative Districts which shall elect delegates to the Constitutional Convention are as set forth in Section 2 of this Article."

The only effect of the Amendment on the apportionment of the Senate is to create two additional senatorial districts in Kent and Sussex Counties increasing the total number of senatorial districts throughout the state from 17 to 21, which would give 7 senators to each of the 3 Counties. The Amendment's effect on the House of Representatives is to create 20 additional representative districts by dividing the existing more populous districts and by providing for additional representation for each increment of 15,000 population residing therein, or any major fraction thereof.

The Amendment results in a House of Representatives composed as follows insofar as New Castle County is concerned:

| DISTRICT | POPULATION | | EFFECT OF AMENDMENT | AVERAGE POPULATION PER REPRESENTATIVE |
|---|---|---|---|---|
| 1 | 7,814) | | Unchanged | 7,814 |
| 2 | 33,772) | City | Add 1 Representative | 16,886 |
| 3 | 18,359) | of | Unchanged | 18,359 |
| 4 | 5,394) | Wilming- | Unchanged | 5,394 |
| 5 | 30,448) | ton | Add 1 Representative | 15,244 |
| 6 | 58,228 | | Add 3 Representatives | 14,557 |
| 7 | 47,509 | | Add 2 Representatives | 15,836 |
| 8 | 23,428 | | Add 1 Representative | 11,714 |
| 9 | 20,040 | | Unchanged | 20,040 |
| 10 | 40,293 | | Add 2 Representatives | 13,431 |
| 11 | 9,325 | | Unchanged | 9,325 |
| 12 | 3,401 | | Unchanged | 3,401 |
| 13 | 5,218 | | Unchanged | 5,218 |
| 14 | 2,534 | | Unchanged | 2,534 |
| 15 | 1,643 | | Unchanged | 1,643 |

The effect of the 1963 Amendment on the election of representatives to the House of Representatives from Kent and Sussex Counties is nil.

Pursuant to the apportionment of the 1963 Amendment, the representative districts of Delaware and the respective ratios of their population and consequent disparities to that of the 15th Representative District, the smallest, is as follows:

| New Castle County Districts | Population | Ratio to 15th Representative District of New Castle County |
|---|---|---|
| 1 | 7,814 | 4–1 |
| 2A | 16,886 | 10–1 |
| 2B | 16,886 | 10–1 |
| 3 | 18,359 | 11–1 |
| 4 | 5,394 | 3–1 |
| 5A | 15,244 | 9–1 |
| 5B | 15,244 | 9–1 |
| 6A | 14,557 | 8–1 |
| 6B | 14,557 | 8–1 |
| 6C | 14,557 | 8–1 |
| 6D | 14,557 | 8–1 |
| 7A | 15,836 | 9–1 |
| 7B | 15,836 | 9–1 |
| 7C | 15,836 | 9–1 |
| 8A | 11,714 | 7–1 |
| 8B | 11,714 | 7–1 |
| 9 | 20,040 | 12–1 |
| 10A | 13,431 | 8–1 |
| 10B | 13,431 | 8–1 |
| 10C | 13,431 | 8–1 |
| 11 | 9,325 | 5–1 |
| 12 | 3,401 | 2–1 |
| 13 | 5,218 | 3–1 |
| 14 | 2,534 | 1–1/2–1 |
| 15 | 1,643 | |

| Kent County Districts | Population | Ratio |
|---|---|---|
| 1 | 6,084 | 3–1/2–1 |
| 2 | 17,806 | 10–1/2–1 |
| 3 | 3,361 | 2–1 |
| 4 | 3,716 | 2–1 |
| 5 | 9,125 | 5–1/2–1 |
| 6 | 2,626 | 1–1/2–1 |
| 7 | 7,880 | 4–1/2–1 |
| 8 | 5,168 | 3–1 |
| 9 | 4,956 | 3–1 |
| 10 | 4,929 | 3–1 |

| Sussex County Districts | Population | Ratio |
|---|---|---|
| 1 | 9,641 | 5–1/2–1 |
| 2 | 6,439 | 4–1 |
| 3 | 9,437 | 5–1/2–1 |
| 4 | 5,318 | 3–1 |
| 5 | 8,140 | 5–1 |
| 6 | 8,010 | 4–1/2–1 |
| 7 | 6,623 | 4–1 |
| 8 | 2,957 | 1–1/2–1 |
| 9 | 4,271 | 2–1/2–1 |
| 10 | 12,359 | 11–1/2–1 |

The disparity in population per representative district in New Castle County is over 12 to 1. Disparities of over 3 to 1 exist within the City of Wilmington and over 7 to 1 in Kent County and 4 to 1 in Sussex County. Furthermore, in almost all cases, disparities are to be found in districts that adjoin one another. The long range effect of the Amendment is to guarantee disparities in the population of the representative districts. The Amendment increases the number of representatives from New Castle County so that approximately 55% of the representatives are allocated to it. The Amendment will, however, permit but 28% of the population of the State to elect a majority of the members of the House of Representatives. This 28% of the population lives in the 23 smallest districts.

The Amendment results in a Senate composed as follows:

| District, New Castle County | | | Effect of Amendment | Average Population per Senatorial District |
|---|---|---|---|---|
| 1 | 52,131 | | Unchanged | |
| 2 | 43,696 | | Unchanged | |
| 3 | 64,345 | | Unchanged | |
| 4 | 64,820 · | | Unchanged | 43,921 |
| 5 | 63,734 | | Unchanged | |
| 6 | 14,543 | | Unchanged | |
| 7 | 4,177 | | Unchanged | |
| Total | 307,446 | | | |
| | | | | |
| District, Kent County | | | | |
| 1 | 23,890 | | Unchanged | |
| 2 | 7,077 | | Unchanged | |
| 3 | 17,005 | | Unchanged | |
| 4 | 7,582 | | Unchanged | 9,378 |
| 5 | 10,097 | | Unchanged | |
| 6 | | 46,063 | | |
| 7 | | 19,534 | | |
| Total | 65,651 | | | |
| | | | | |
| District, Sussex County | | | | |
| 1 | 16,080 | | Unchanged | |
| 2 | 14,755 | | Unchanged | |
| 3 | 16,150 | | Unchanged | |
| 4 | 9,580 | | Unchanged | 10,456 |
| 5 | 16,630 | | Unchanged | |
| 6 | | 38,975 | | |
| 7 | | 34,220 | | |
| Total | 73,195 | | | |

Under the Amendment the population disparities in New Castle County in the 7 senatorial districts would range from 4,177 in the 7th Senatorial District to 64,820 inhabitants in the 4th Senatorial District, or a ratio of more than 15 to 1. In Kent County the population disparities between districts range from 7,077 inhabitants in the 2nd Senatorial District to 46,063 in the 6th Senatorial District, or a ratio of approximately 6½ to 1, and in Sussex County the population disparities between districts range from 9,580 in the 4th Senatorial District to 38,000 in the 6th Senatorial District, or a ratio of more than 4½ to 1. The average population for each senatorial district in the three Counties ranges from 43,921 in New Castle County for each senator elected to 9,378 in Kent County, or a ratio of more than 4½ to 1 between the counties.

The election of 7 senators in each county irrespective of population creates a situation whereby Kent County with about 14½% of the total population of Delaware will elect ⅓ of the Senate, and Sussex County with about 16½% of the total State population will elect ⅓ of the Senate. New Castle County with about 69% of the total State population will elect ⅓ of the Senate.

The Amendment adds two at-large senatorial districts in both Kent and Sussex Counties superimposed on existing senatorial districts. By reason of this, each resident [11] of New Castle County is entitled to vote for and elect 1 senator in the General Assembly of Delaware while each inhabitant of Kent and Sussex Counties will elect 2 senators to represent him in the General Assembly.

The Amendment gives little or no consideration to population with regard to the apportionment of representation in the Senate.

The Amendment also provides that in the event a Constitutional Convention be

11. The term "resident" is used in the statement of facts stipulated in this part of the pretrial order.

called, as provided in Section 2, Article XVI of the Constitution of 1897, the number of delegates and the method of electing them shall not be affected by the addition of representatives or representative districts created by the Amendment and that for the purpose of any future Constitutional Convention, the representative districts shall elect delegates to the Convention on the basis of apportionment provided by Section 2 of Article II as it existed prior to the 1963 Amendment.[12]

We find further that in the decade 1952 through 1961 the State Tax Commission has collected a total of $239,000,000, of which $166,900,000 represented personal income taxes, $23,500,000 represented inheritance and estate taxes, $10,800,000 represented license fees and $16,190,000 represented cigarette and cigar tax collections.[13] The State Tax Commission Reports indicate that in excess of 92% of the total taxes have been collected in New Castle County in that period, that 3% were collected in Kent County and 5% were collected in Sussex County. Of the $166,900,000 collected for personal income taxes, approximately 92% were collected in New Castle County, 3% in Kent County and 5% in Sussex County. Of the $23,500,000 collected for inheritance and estate taxes, approximately 94% were collected in New Castle County, 2% in Kent County and 4% in Sussex County. Of the $10,800,000 collected for licenses, approximately 70% were collected in New Castle County, 12% in Kent County and 18% in Sussex County. Of the $16,190,000 collected by the Commission for cigarette and cigar taxes in the decade, approximately 74.3% were collected in New Castle County, 12.4% were collected in Kent County and 13.3% were collected in Sussex County.

Collections made by the State Tax Commission in the same decade, broken down to illustrate the amount of taxes collected in each of the three Counties in accordance with their respective Representatives in the General Assembly, show that, excluding franchise and corporation taxes, the amounts collected averaged approximately $13,000,000 per representative in New Castle County, less than $1,000,000 for each representative elected in Kent County, and approximately $1,000,000 for each representative in Sussex County. In the same period New Castle County collected approximately $10,500,000 in personal income taxes for each representative, while Kent County collected less than $500,000 for each representative, and Sussex County collected approximately $800,000 per representative.[14, 15] The effect of the Amendment is to give to Kent and Sussex Counties with 31% of the total State population the ability to control measures requiring a two-thirds vote in the Senate including revenue measures and appointments by the Governor. The combined voting strength of Kent and Sussex Counties in the Senate will be able to override the executive veto.[16]

■ Representation strictly according to population is a comparatively new historical concept. In many bodies somewhat similar to state legislatures, there is representation according to factors other than population; for example, the Congress of the United States, the General Assembly of the United Nations, and the House of Lords in England. One of

---

12. The provisions of Section 2B have been quoted at an earlier point in this opinion.

13. Plaintiffs' Exhibit No. 4.

14. See plaintiffs' Exhibit No. 3.

15. In the six-year period prior to the filing of the suit at bar, the General Assembly received approximately seven bills having as their object the reapportionment of Delaware either by a constitutional convention or by constitutional amendment. Prior to the inception of the suit at bar each of these bills, with the exception of one which was introduced by Senator Elwood M. Melson, failed to emerge from committee. The Melson bill providing for reapportionment was voted out of the Senate Committee but was defeated.

16. See Section 18, Article III, Constitution of 1897 as amended. Del.C.Ann. (1962 Supp.).

the traditional concepts of state government in the United States is political area representation. Political area representation is used as a means of apportioning representation in legislative groups on an international and national basis, a state basis and a city basis. Most of the States have representation in one of their houses, usually the senate, on a county or political area basis. The formation of representative districts in state government is normally the function of the legislative branch. The prevailing theory of government in the United States is a bicameral system. As to the unicameral system, that of Nebraska was adopted in 1937 and although there have been attempts in approximately 50% of the states since 1937 to set up similar systems no other state has done so.

The area basis of representation has emerged as a political concept in Delaware. What is now the State of Delaware results from an emergence of the so-called "Three Lower Counties-on-the Delaware" of William Penn's Colony. The three lower counties had an organization separate and apart from any other colony and were created by a fission from the mother Colony. A more detailed explanation is necessary. There was a legislature which met in the three lower counties and passed legislation for them which could be approved or disapproved by the representative of the governor of Pennsylvania. In 1704, the three lower counties separated completely from the Province of Pennsylvania except for the office of Governor General. The people who resided in the three counties joined together in 1776 and created an organization completely independent of the colony and the Commonwealth of Pennsylvania. Delaware existed as a State prior to the creation of the United States. For at least one hundred years prior to 1776 the three Counties had been in existence. From time to time there was a Colonial Assembly and later a state assembly or legislative body for the three lower Counties on the Delaware River in which there was equal representation from each one of the three Counties. That system continued to exist until the adoption of the Constitution of 1897, having been embodied in the Constitution of 1776, the Constitution of 1792 and the Constitution of 1831.

In 1896 the population of each of the three Counties, excluding Wilmington, was approximately equal. The Constitution of 1897 varied the pattern of equal representation from the three Counties by adding five representatives for New Castle County and two for the City of Wilmington. The basis for this addition is not clear from the constitutional debates.

Pursuant to state statutes, the counties, *qua* county, exercise the following legislative functions or rights: (a) to assess and levy, collect and receive taxes, 9 Del.C.Ann. § 8601, et seq.; (b) to appropriate and borrow money, 9 Del.C. Ann. §§ 4111, 4131, 4133, 1522, 1561, 1563, 6111, 6131, 6132, 6205; (c) to establish pension plans for employees, 9 Del.C.Ann. § 1701, et seq.; (d) to appropriate money for the indigent sick, 9 Del.C.Ann. §§ 1801, 4201, 6205; (e) to appropriate money for welfare purposes, 9 Del.C.Ann. § 1521 and 31 Del.C. Ann. §§ 329 and 513; (f) in New Castle County to designate firemen and policemen, 9 Del.C.Ann. § 1903; (g) to provide an ambulance and rescue service, 9 Del.C.Ann. § 2001; (h) to supervise street and highway lighting if the taxable people within the area petition it, in which event the Levy Court acts as a holding company to make the proper contract, 9 Del.C.Ann. § 2101; (i) general supervision over sidewalks, fire hydrants, water mains, sanitary and drainage sewers, when fifty per cent or more of the taxable people in a certain area petition that this be done, 9 Del.C.Ann. § 503; (j) to control garbage and refuse collection and disposal thereof, 9 Del.C.Ann. § 2401; (k) as to New Castle County, jurisdiction with respect to planning and zoning, 9 Del.C.Ann. § 2601; (*l*) certain jurisdictional authority with respect to parks and recreation, 9 Del.C.Ann. §§ 610 and 616; and (m) the Register of

Wills, Prothonotary, Sheriff, Coroner and Recorder of Deeds carry out the general state laws under the respective county governments, 9 Del.C.Ann. § 9101 et seq., § 9502 et seq., § 9603 et seq.

In colonial days the Levy Courts had the power to administer alms houses, and were until 1935 overseers of roads. They also had the power to tax but did not make the general laws.

## II.

We point out that the rights asserted by the plaintiffs are personal rights, indeed that they may be described as "personal civil rights", and that they are of great importance. Mr. Justice Brennan stated that one of the jurisdictional questions presented by Baker v. Carr was whether or not the plaintiffs had "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for the illumination of difficult constitutional questions. * * *" He went on to say: "This is the gist of the question of standing. It is, of course, a question of federal law." See 369 U.S. at p. 204, 82 S.Ct. at p. 703.

■ The answer given by the Supreme Court to its own question in the cited case, as we know, was that the plaintiffs had standing to maintain the suit if their franchises had been subjected to invidious discrimination and if they had a personal stake in the outcome of the controversy. Baker v. Carr, supra, pp. 204–208, 82 S.Ct. at pp. 703–705. So is it here. We find, as we have stated in earlier opinions, that the plaintiffs can maintain the instant suit, that the cause of action is cognizable under federal law, and that we have jurisdiction of the subject matter and of the parties.

■■ What we have found under the previous heading of this opinion demonstrates that Section 2 of Article II of the Constitution of Delaware as it existed prior to the 1963 Amendment and as it exists today creates such an inequality in voting power, resulting in invidious discrimination, as to bring it within the proscription of the Fourteenth Amendment of the Constitution of the United States. Baker v. Carr, supra; Sincock v. Terry, supra, 207 F.Supp. 205. This is true as to the apportionment of the Senate as well as to the apportionment of the House of Representatives of the General Assembly of Delaware. While mathematical exactitude in apportionment cannot be expected, and indeed is not possible in an absolute sense, disparities created by Section 2 of Article II, as it was prior to the 1963 Amendment and as it is now, are of such a startling nature as to demonstrate a debasement of franchise of individual electors of this State which the Equal Protection Clause of the Federal Constitution cannot tolerate.

■ In respect to the apportionment of the House of Representatives of the General Assembly under Section 2 of Article II as it existed prior to the 1963 Amendment finding one disparity approximately as large as 35 to 1 in one instance and very gross in many others, the representatives of the six least populous representative districts containing only 16,552 inhabitants having equal voting power with the six most populous representative districts, containing 233,718 persons, and the vagaries existing in representative districts even contiguous to each other, both in rural areas and in the City of Wilmington and the other facts as we have found them under heading "I", we state that we can find no rational basis for the apportionment. In respect to the apportionment of the House of Representatives under the 1963 Amendment which reflects one disparity as high as 12 to 1, several at 11 to 1, 10 to 1 and 9 to 1, many at 8 to 1, the lowest at 1½ to 1, and the vagaries existing in representative districts even contiguous to each other both in rural areas and in the City of Wilmington, for example, 28% of the population of Delaware able to elect a majority in the House of Representatives, and the other facts as we have found them, we state that we can find no rational

basis for the apportionment. An examination of the record will show that not one of the experts on political science, including Doctor Pollock called by the defendants, suggested that a House of Representatives apportioned on considerations other than those reflecting population to geographical areas with reasonable exactitude could find support in reason. Putting the matter plainly the apportionment of Section 2 of Article II, new or old, is capricious, arbitrary, and invidiously discriminatory when viewed in the year 1963. In apportioning the House of Representatives the basis must be one of population. "One vote, One person" must be the aim. Gray v. Sanders, 83 S.Ct. 801 (1963).

As to the invalidity of the apportionment of the Senate there are certain arguments which we must discuss. The defendants assert that a number of factors affect the apportionment of the Senate of the General Assembly of Delaware which must be taken into consideration, no matter how one may view the apportionment of the House of Representatives, and that Section 2 of Article II of the 1897 Constitution, when it was framed and promulgated, represented a realistic and valid apportionment of the Senate; but their position as to the validity of apportionment under that Constitution in the light of the statistical picture afforded by the 1960 Census is at best somewhat nebulous. We do not understand them to actually assert that the apportionment provided for by Section 2 of Article II, as it was prior to the 1963 Amendment is valid today as meeting the guarantee of the Equal Protection Clause of the Fourteenth Amendment, but on the other hand some of them at least have not abandoned such a contention completely. To put the matter briefly, we believe that such a contention, if it be made, is not sound. Employing the 1960 Census we have seen that 7 senators were apportioned to New Castle County having a population of approximately 307,000, as compared with 5 senators in Kent County having a population of approximately 65,000, and Sussex County having a population of approximately 73,000 with 5 senators. The City of Wilmington, with a population of approximately 95,000, as contrasted with Kent and Sussex Counties having populations as stated, possessed but 2 senators as contrasted with 5 for each of the two lower counties. Assuming that factors such as history, economic conditions, diverse interests, county governmental functions, geography and other considerations dealt with more specifically hereinafter, which have been designated by the Professors of Political Science and in particular by Doctor Pollock as "Area" factors, are completely applicable here, nonetheless they are insufficient to afford any substantial basis of support for the very gross population disparities demonstrated by this record. In short, the apportionment of old Section 2 of Article II in the light of the 1960 Census must be held to be irrational, arbitrary, and invidiously discriminatory.

As to the apportionment of the Senate under the 1963 Amendment, the population disparities in New Castle County in the seven senatorial districts range from approximately 4,000 persons in the 7th Senatorial District to approximately 64,000 in the 4th Senatorial District, a ratio, as we have seen, of more than 15 to 1 for each senator elected. In Kent County the apportionment created by the Amendment is equally arbitrary for the population disparities range from about 7,000 inhabitants in the 2nd Senatorial District to approximately 46,000 persons in the 6th Senatorial District, or a ratio of approximately 6½ to 1 for each senator elected. Viewed overall, the range in each senatorial district in the three Counties is from approximately 44,000 inhabitants in New Castle County for each senator elected to approximately 9,000 persons in Kent County or a ratio of more than 4½ to 1. It is also apparent, as we have already stated, that New Castle County with 69% of the State's population, will elect ⅓ of the Senate, whereas the two lower Counties with approximately 31% of the total population will elect ⅔ of the Senate.

■ The defendants contend that the Federal principle can be rationally employed at least for the apportionment of the Delaware Senate on a county basis as if the respective Counties possessed some degree of sovereignty. This contention is perhaps the one most relied on by the defendants. We therefore consider it first. The Federal principle is based upon the Connecticut Compromise and the origin and nature of the Compromise can be stated briefly as follows. In the 1787 Convention, which framed the Constitution of the United States, the larger States supported the so-called Virginia plan to create a bicameral legislature in which the rights of suffrage ought to be proportioned to the quotas of contributions or to the number of free inhabitants of the respective States. The more populous States, since they thought that they would have to bear a greater burden taxwise and in other respects, sought a proportionally larger share of control of the central government, and the smaller States, such as Delaware, understandably did not desire to be controlled by their larger sisters. The Constitutional Convention was deadlocked when Roger Sherman of Connecticut proposed as a compromise one of the great political inventions of all time.[17] The problem was one of balance of power in a federation of States differing greatly in size, wealth and population. Sherman suggested that there should be two Houses, one with equal and the other with proportional representation. This was not quite acceptable to either the large state group or the small state group but the Sherman proposal was amended to link direct taxation and representation in the House of Representatives and these amendments were adopted and the Sherman proposal, so amended, was approved. It is generally believed by historians to be a fact that without the adoption of the Connecticut Compromise, the Federal principle, our Constitution could not or at least would not have been created when it was. But the fact that the Compromise in effect created Section 3 of Article I of the Constitution of the United States does not make the Federal principle, or as we would prefer to call it, under the circumstances of the instant case, the "County principle", logically applicable for the purposes of the Fourteenth Amendment in apportioning a state general assembly.

■ We find it difficult to relate the Federal principle in any very significant way to the defendants' contentions supporting the apportionment of the Senate of the General Assembly of Delaware under Section 2 of Article II, either old or new. The creation and application of the Federal principle were forced by the sovereignties of the 13 original Colonies or States and there never was much and there is now no sovereignty in the Counties of Delaware, though like counties of almost every State, our Counties possess and exercise some local governmental functions. The governmental functions of the three Counties of Delaware have decreased steadily since 1787 [18] and have declined notably even within the memories of the members of this court. For example, we take judicial notice of the diminution of powers of the respective Levy Courts of the three Counties, the creation of the State Highway Department to service the effective system of roads which has pulled the State together and made the inhabitants of the three Counties easily and quickly accessible to one another, the rise of central educational governance, and the creation of State taxing agencies. To create a Senate on a purely county sovereignty principle, under the circumstances at bar, would seem to be quite unrealistic insofar as history and the Federal principle are concerned. But there have always been three Counties in Delaware and the culture and mores of our people to some degree have been formed upon these

17. An English wit, whose name escapes us, has remarked that the Connecticut Compromise was the only great political invention since the queue.

18. It will be borne in mind that Delaware, the first State to ratify the Constitution of the United States, did so on December 7, 1787.

county units. Under these circumstances history must be deemed to deserve a little more courtesy than a mere distant bow, albeit no submissive genuflexion.

The geographical differences between the upper and lower parts of Delaware asserted by the defendants as a rational distinction for apportionment need not concern us long. It is true that the upper part of the State and some of the upper Hundreds of New Castle County, for example, Mill Creek Hundred and Christiana Hundred, are slightly hilly and that the southern part of New Castle County and Kent and Sussex Counties are flat, but there is no geographical feature which prevents the residents of any County from easy access to those of another, or which obstructs face-to-face communication between the citizens and members of the General Assembly. Lack of accessibility was the point made by Doctor Pollock in respect to the upper Michigan Peninsula where additional representation was felt to be required. Indeed, Doctor Pollock, on cross-examination, made it clear that in respect to geographical features only extraordinary ones like the inaccessibility of the upper Michigan Peninsula to the rest of that State could justify the election of additional representatives to the lower House of a legislature and the consequent dislocation of the principle of strict representation of population therein. Doctor Pollock made it clear that he did not know whether Delaware possessed any potent "Area" factor or not. The plaintiffs' experts stated that in their opinion there was no such substantial geographical "Area" factor.

We have discussed the apportionment of the Senate on what may perhaps be aptly termed a "County Basis" but we desire to make it clear that there must be no invidious discrimination in apportioning senatorial districts vis-a-vis each other *within* the three respective Counties of Delaware. That such discriminations existed under old Section 2 of Article II and exist under the 1963 Amendment is made apparent by the last table set out in this opinion. Some of these discriminations are discussed specifically in the first paragraph following the table. "One vote, One person" must be the aim here as in apportioning the House of Representatives on a *State-wide* basis. While this might result oddly in some instances, for example in senatorial districts respectively bordering on the New Castle County-Kent County boundary line, contiguous to each other, where a vote of an inhabitant of Kent County might be worth more than the vote of an inhabitant of New Castle County, such a result is not compulsory if adequate allocations of senatorial seats per county were made.

In apportioning the Senate we think that economic factors must be treated as "Area" factors. Large parts of the three Counties of Delaware are devoted to agriculture. There is a good industrial development in the State. While a somewhat larger percentage of this lies in New Castle County, Kent and Sussex Counties are developing industrially very rapidly. Wilmington is of course the metropolis of Delaware with some density of population, but what is legally the City of Wilmington is surrounded by suburban and semi-suburban areas interspersed rather chaotically with industrial development and suburban and semi-suburban areas. The City of Dover, the Capital of Delaware, and the larger cities in Sussex County, such as Seaford, are similarly expanding industrially. Wilmington does possess a good large port but port facilities for large industrial interests presently exist down the Delaware River on the Delaware side well south of Wilmington, while Lewes, in Sussex County, possesses the potentiality of a great port. Industry is moving steadily down the State as part of a tremendous development that within the lifetime of many who may read this opinion will result in an industrial area stretching from the New York City-Newark-Hoboken-Jersey City locale through the Delaware Valley in New Jersey and Pennsylvania to a point well below the National Capital. Although population density, extent of agricul-

tural and industrial development and expanding city and suburban and semi-suburban areas are deemed to be cogent factors in considering apportionment, no very persuasive factor justifying any very special treatment in the apportionment of the Senate of the General Assembly can fairly be said to lie in any purely geographical factor.

But other factors remain to be considered. Custom is a powerful force in any community whether it be large or small. The Constitution of the United States, with its bicameral Houses in which political recognition is afforded to the smaller Sovereignties such as Delaware and Rhode Island, has exercised a most potent force on the formation of the Constitutions of the States and we entertain no doubt that the States which have adopted the Federal principle of quite unequal Senatorial representation, albeit with comparatively small logic, have looked to the Federal Constitution as a guide. Reapportionment is disruptive and whether it be applied willingly as it should be through the medium of a State legislature or reluctantly by a court, it should be brought into play as gently as the Equal Protection Clause of the Federal Constitution will permit. Therefore the General Assembly should make no very broad application of the Federal principle, or as we would prefer to call it the "County principle", to the reapportionment of the Senate of the Delaware Assembly. Cf. Sobel v. Adams, 208 F. Supp. 316 (D.Fla.1962); Sims v. Frink, id. 431 (D.Ala.1962); Toombs v. Fortson, 205 F.Supp. 248 (D.C.1962); and Maryland Committee for Fair Representation v. Tawes, 228 Md. 412, 180 A.2d 656 (1962). We note parenthetically that the principle of apportionment of the senate of the bicameral state legislature is presently before the Supreme Court of the United States in the case last cited and in others. Of course, in a matter of this sort, the Supreme Court of the United States has the last word.

A factor which may perhaps justify some deviation from the principle of population representation in the Delaware Senate, rather strictly applied, is the fact that individual localities in the respective Counties themselves possess different views as to important local issues. Zoning will serve as an example. Whether zoning should be of general application throughout the State of Delaware or should be applied city-wise, county-wise, or by Hundreds, is fortunately not a matter which has to be determined by this court. But the principle of close balance within one house of a bicameral legislature is a desideratum. Evidence in the record supports this view. See for example the testimony of Professor Hanson. But none of the considerations which we have stated or discussed will, we think, permit any wide deviation from the principle of population representation in the apportionment of the Senate of the General Assembly of Delaware. The heaviest weight in apportionment of the Senate must be on population representation but since dislocation caused by reapportionment should be kept to the minimum and yet meet the requirements of the Fourteenth Amendment we conclude that some weight could be given to some of the factors deemed cogent in this opinion.

As to the 2 additional senators allotted to Kent and Sussex Counties superimposed on existing senatorial districts, viz., Districts 6 and 7 in Kent and Sussex Counties, so that voters in Kent and Sussex Counties will elect two senators while the voters of New Castle County will continue to vote for but one senator, this seems to involve a hidden gerrymander that cannot be countenanced and if the reapportionment created by the 1963 Amendment met the requirements of the Equal Protection Clause in all other respects, though it does not, this feature alone, in the absence of any substantial possibility of , severability,[19]

19. See Sutherland, Statutory Construction, 3 ed. Horack, Vol. 2. pp. 174–198, Sections 2401–2419 (1943).

See also 11 American Jurisprudence Constitutional Law, Section 52 (1937) as follows: "The question may arise as to

would require us to adjudge the whole Amendment unconstitutional.

We reach the reluctant conclusion that not only is old Section 2 of Article II unconstitutional under the Equal Protection Clause but that the 1963 Amendment falls equally within the proscription of the Federal Constitution. In our opinion the 1963 Amendment and Section 2 of Article II as it existed prior thereto represent gross and invidious discrimination in respect to the value of the legislative votes of the plaintiffs and those situated like unto them. The apportionment effected by either of them is not reasonable or rational. Baker v. Carr, 206 F.Supp. 341 (D.Tenn.1960), after remand. Moss v. Burkhart, 207 F.Supp. 885 (D.Okla.1962); Sims v. Frink, supra; Sanders v. Gray, 203 F.Supp. 158 (D.Ga.1962); Toombs v. Fortson, supra. We have no recourse, therefore, but to declare both constitutional provisions, new and old, to be unconstitutional. In so stating we are aware that there is a strong presumption that every State Constitution is constitutional when measured by the Constitution of the United States. Sobel v. Adams, supra. The presumption has been overpowered in the case at bar. A judgment will be entered to that effect.

### III

But a further opportunity must be given to the General Assembly of Delaware to work out the problem of reapportionment. We acknowledge the difficult problem faced by the General Assembly of Delaware in attempting to frame a reapportionment statute that will meet the guarantee of the Equal Protection Clause of the Fourteenth Amendment. Therefore, we believe it to be within the permissive bounds of propriety for a court laboring in this field to state what it considers to be the minimal constitutional requirements under Baker v. Carr and the adjudications which have grown out of it. We have endeavored to do this to some extent under heading "II" of this opinion but we think we should go further in our attempt to lay down guidelines for the General Assembly. At least one House of the General Assembly of Delaware (the House of Representatives) must be apportioned on an equal population basis as nearly as this can be accomplished in order to meet the requirement of rationality and, further, to avoid any taint of invidious discrimination, the population in any given representative district must not vary from the population quotient used, whatever it may be, to a degree that would be obviously unfair. As we have said, "One vote, One person" must be the aim. Gray v. Sanders, supra. The ideal quotient, of course, would be supplied by dividing, for example, the number of representatives, say 35, by the number of inhabitants in the State. The number "35" is, of course, not a magic number or one of art. We are of the opinion that the existing election districts may be employed as a measurement to effect this end but this does not mean

the effect of partial invalidity of a constitutional amendment. In accordance with the rules governing the invalidity of portions of a statute, it has been held that where part of an amendment to a state constitution is invalid because it violates the Fourteenth Amendment to the Federal Constitution, if the several parts of the amendment are separable, the valid portions may be saved, unless it is obvious that the intent of the adopters of the amendment was to accept one general scheme in an entirety, in which event, if part of the amendment falls, the whole must fall with it. Similarly, the inclusion in a state constitution of a clause prohibiting a greater charge by a carrier for a short than for a long haul, applying to commerce coming from or going to other states, in violation of the commerce clause of the Federal Constitution, does not render the whole article void if such an invalid provision can be eliminated and leave a complete scheme of legislative prohibition against discrimination by carriers." No possibility of severablity seems to exist as to any major portion of Section 2, Article II, new or old.

Since the Federal Constitution applies, the issues must be decided by Federal law. We assume, however, that in this respect there is small if any difference between State and Federal laws. See Badger v. Hoidale, 88 F.2d 208, 211 (8 Cir. 1937).

that if the General Assembly should choose to reconstitute geographical areas to create new and quite different election districts it would not be within its power to do so. This court would not look upon such a result with lack of favor.

■■ State Court decisions, prior to the Supreme Court decision in Baker v. Carr, which have attempted to formulate distinctions between "permissible and impermissible equality" may be of assistance to the General Assembly and its very competent counsel. Studying these cases one commentator has drawn the following conclusions: "The standard most often used by the court is a comparison between the largest and smallest districts, according to population in relation to each other and the average or theoretically perfect district. These cases suggest that when the standard is equality of population, an apportionment plan resulting in one district containing more than double the population of another will be invalid. The collected state cases show that an almost equal number of legislative apportionment laws resulting in ratios of under two to one, supposedly apportioned on the basis of population have been sustained or validated, while virtually every law yielding districts with over a two to one ratio has been declared unconstitutional." See The Yale L.Journal, Vol. 72, No. 1, p. 93. For a compilation of State decisions in this regard, see id. pp. 101–104, Appendix B. But the validations of ratios of two to one in population referred to in the cases cited in Appendix "B" will be found, we think, to have occurred in States with larger populations and much more diverse and varied interests than those present in Delaware. A ratio of two to one is one of 100% and we can perceive no sound basis for such a broad ratio in this State. In fact, under the plaintiffs' plan referred to in the Appendix of this opinion, the largest discrepancy is actually, as we estimate it, only a little more than 50% and this is compiled in the three or four instances in which it occurs by the use of existing representative districts. Some latitude can be allowed as a practical matter but it must be such as is required by the geography and mathematics of the situation and must not be too great. There has been no evidence or any acceptable argument of counsel presented in this case which would warrant a conclusion that a proportion of even slightly more than 50% would be constitutionally acceptable, save possibly, as we have indicated already, in those few situations referred to in the testimony of the political scientists of the plaintiffs, where a slightly higher deviation than 50% is compelled by adhering to the present lines of contiguous election districts. Compare by way of example, the plaintiffs' plan for apportionment of the House of Representatives and the ratios therein set out based upon the combining of contiguous election districts as they now exist without overlapping county boundaries.

As we have stated and as we hope we have made clear to everyone who will read this opinion, the 1963 Amendment allocates 7 senators to each County but the 7 senators allotted to New Castle County represent a geographical area containing 69% of the population of Delaware. A House of Representatives elected on a strict population basis and a Senate elected on a strict area basis as provided by the 1963 Amendment could give the majority of the voters a veto power but it could not assure them legislative strength to take affirmative action on measures which might be very necessary for the general welfare of the State.

■■ Such affirmative action must be rendered possible and, as we have already indicated, an apportionment should not be permitted that would allow a blockage of major legislation desired by the great majority of electors of Delaware to come to pass in the Senate. Effecting the will of the majority of the people of a State must be deemed to be the foundation of any apportionment plan. Applying this principle, it seems clear that the House of Representatives must be apportioned on a strict population basis. However, other cogent and relevant factors,

as indicated in this opinion, may be accorded some weight in apportioning the Senate of the General Assembly of Delaware: provided, nonetheless, as we have said, that in apportioning senatorial districts vis-a-vis each other *within* the three Counties the aim must be "One vote, One person". To give effect to such factors, indicated herein to be of cogency, relevancy, and of some weight, in apportioning the Senate of the General Assembly of Delaware as a whole, should not be thought of as necessarily destroying the foundation principle of majority rule, or effecting invidious discrimination or irrationality in apportionment. We state again, however, at the risk of needless repetition, that giving effect to the factors referred to must not be allowed to govern to such an extent that an area containing a substantial portion of the population of Delaware, *vide ante* New Castle County containing 69% of the population of Delaware, could be put in such an inferior position in respect to the Senate that legislation needed for the good of the whole State might be blocked. What we have said is, of course, precatory and not absolute. We cannot foresee what the General Assembly in its wisdom may see fit to effect.[20]

We say again, as we have stated in this opinion and in other opinions in this case and during the course of the trial, that the primary duty of apportionment must rest with the General Assembly. This court should not be compelled to embark upon the task of reapportionment because of legislative reluctance. The good of the State requires careful, even prayerful, study of all relevant factors and circumstances and the consideration of whole State interests, and a well-devised, reasonable and fair plan of apportionment. The matter is one which

requires expert assistance, as we testify to from our own knowledge. The General Assembly, constituted under old Section 2 of Article II will be freed of the apportionment provisions of Section 2 of Article II, old and new, by our judgment in this case. It may then proceed to pass an apportionment statute meeting the requirements of the Fourteenth Amendment and those of Section 3 of Article I of the Constitution of Delaware which we, as presently advised, regard as substantially identical. We wish to make it clear, however, that there is doubt as to the length of continuance of the *de facto* existence of the 122nd General Assembly beyond the present terms of its members as provided by Section 2 of Article II which we shall declare unconstitutional. Cf. Section 1 of Article II. In so stating we are aware of the statements respecting this issue in Scholle v. Hare, 367 Mich. 176, 116 N.W. 2d 350, 357 (1962). We point out, for example, that if a bond issue had to be authorized by the present General Assembly in, say, February 1965 on the theory of the *de facto* continuing powers of its members, financial authorities might look with some hesitancy upon the sale of securities so authorized. In our present-day complex modern economic civilization surety in financial matters seems to be of the essence. We state again that this court has not the slightest desire to deprive the citizens or the General Assembly of this State of their rights, nor have we any desire to assume their responsibilities.

## IV

The State of Delaware, the General Assembly, and this court all seem to be trapped in a kind of box of time. The exigencies of the calendar and the on-

---

20. In considering these standards we noted that in Delaware there is no provision for apportionment by popular referendum. Apportionment is locked in the breast of the General Assembly of Delaware which itself was elected contrary to the provisions of the Constitution of the United States. We recognize, adhere to, and believe relevant to the standards articulated the principle that both form and power of government are derived from the consent of the governed. Were this principle operative in Delaware, i. e., provision for the General Assembly to be determined by popular concensus, a different problem might be presented. See McCloskey, The Reapportionment Case, 76 Harv.L.R. 54 (1963).

coming general election of 1964 confront us. We will allow a reasonable period for the General Assembly to proceed to try its hand again at the problem of reapportionment. We cannot withhold the entry of our judgment on this phase of the case, however, for if we did so the General Assembly would be without power to act except by way of a further attempt to create a valid constitutional amendment. This would require action again by two successive General Assemblies under Section 1 of Article XVI of the Constitution of Delaware, or by a Constitutional Convention under Section 2 of Article XVI. The latter would itself present a grave danger of an unconstitutional result by reason of a possible denial of equal protection of the laws because of the convention-delegate apportionment set up by Section 2 of Article XVI, Del. C.Ann. A third possibility would be a Constitutional Convention, called by the Governor or by proper citizenry action under the doctrine of the inherent right of the citizens of a State to create or revise their Constitution. Cf. Wells v. Bain, 75 Pa. 39 (1874). Such a gross predicament, a miscarriage of the power inherent in the people of this State, cannot be avoided by assuming that *de facto* powers would inhere in the members of the 122nd General Assembly of Delaware past the terms prescribed for them by Section 2 of Article II of the Delaware Constitution for there could not be two valid successive General Assemblies to effect a valid revision of Section 2 of Article II unless by virtue of an election system established by the decree of this court. The action to be taken by the 122nd General Assembly upon the entry of our judgment cannot be anemic in its nature.

Having the box of time in mind the provisions of Rule 16 of this court will be strictly adhered to. Within 5 days of the filing of this opinion or within 5 days from the date of the denial of rehearing, whichever shall be the later, the parties are to prepare a decree and submit it to the court. We of course must allow the General Assembly a reasonable time in which to fulfill its duties. Accordingly we will allocate to the General Assembly a period of time from the date of the entry of our final decree up to and including October 1, 1963, to prepare and enact into law a reapportionment statute acceptable under the law and the guidelines we have endeavored to lay down herein. After our final decree has been entered, if no appeal to the Supreme Court has been filed in the meantime, we may have further hearings upon a plan of reapportionment to be ready to be applied as a temporary alleviant only while the General Assembly fulfills its duty.

Relevant pending motions will be held in abeyance as and until the court advises itself further.

Further relief will be denied to the plaintiffs at this time but this denial shall be deemed to be without prejudice.

Findings of Fact and Conclusions of Law are set out in this opinion in accordance with rule 52(a) Fed.R.Civ.Proc., 28 U.S.C.

## APPENDIX

### SOME OBSERVATIONS RESPECTING THE PLAINTIFFS' MINIMUM PLAN

The plaintiffs have submitted a plan of apportionment and their efforts have been of very substantial assistance to the court. The remarks made hereinafter are not intended to decry the validity of their efforts but we think we should state the following.

The difficulty of framing an efficacious apportionment plan cannot be overestimated. The plan must not only be consistent with the guarantee of the Equal Protection Clause but must also be workable in the pragmatic day-to-day sense.

The plaintiffs' plan is premised on the concept that population is the substantial and vital factor in apportionment. Using the representative districts set out in Article II, Section 2 of the Delaware Constitution as the basic unit, the following four rules were used by the plaintiffs to arrive at new representative dis-

tricts: (1) the small districts are consolidated and extra representatives allocated to large districts so as to minimize the disparity in population per representative; (2) only contiguous districts are consolidated and a consolidated district cannot cross county or City-of-Wilmington lines; (3) districts are compact; and (4) no district larger than the ideal size, 12,751,[1] is consolidated. By applying these rules to the formulation of representative districts the plaintiffs establish an apportionment which apparently, with few exceptions, does not have more than a 50% population deviation per representative per district. Of the 35 representatives, 7 are allocated to the City of Wilmington, 17 to rural New Castle County, 5 to Kent County and 6 to Sussex County. These districts were presented on maps.[2] A chart compilation of the maps showed:

| Rep. Dist. | Pop. | No. of Reps. |
|---|---|---|
| Wilmington: | | |
| 1 & 4 | 13,208 | 1 |
| 2 | 33,772 | 3 |
| 3 | 18,359 | 1 |
| 5 | 30,488 | 2 |
| Total | 95,827 | 7 |
| Rural N.C.: | | |
| 6 | 58,228 | 4 |
| 7 | 47,500 | 4 |
| 8 | 23,428 | 2 |
| 9 | 20,040 | 2 |
| 10 | 40,293 | 3 |
| 11 | 9,325 | 1 |
| 12, 13, 14, 15 | 12,796 | 1 |
| Total | 211,619 | 17 |
| Total N.C. | 307,446 | 24 |
| Kent: | | |
| 1, 3, 4 | 13,161 | 1 |
| 2 | 17,806 | 1 |
| 5 | 9,125 | 1 |
| 6, 9, 10 | 12,511 | 1 |
| 7, 8 | 13,048 | 1 |
| Total | 65,651 | 5 |
| Sussex: | | |
| 1 | 9,641 | 1 |
| 2, 3 | 15,876 | 1 |
| 4, 5 | 13,458 | 1 |
| 6, 9 | 12,281 | 1 |
| 7, 8 | 9,580 | 1 |
| 10 | 12,359 | 1 |
| Total | 73,195 | 6 |
| Total State | 446,292 | 35 |

In presenting the plan in the first instance, the plaintiffs did not divulge whether those districts which were to have more than one representative were to elect these at-large or whether further line-drawing was required. Had this point been overlooked and had this court adopted the plan as originally proposed, it would not have been possible for the election boards to conduct an orderly election without making allocations which could not be found to be in fact or in law within their spheres of responsibility. On cross-examination

1. This is the figure arrived at by dividing the total population of Delaware by 35, the number of representative districts.

2. The maps did not show the precise bounds of the representative districts.

To the extent that the plan is based on Section 2, Article II, representative districts and their exact metes and bounds can be ascertained from the Delaware Code.

this deficiency appeared and thereafter counsel for the plaintiffs agreed to present further evidence concerning subdivision of the districts with more than one representative.

The plan as first presented was supplemented as follows: Proposed representative districts entitled to more than one representative were broken into smaller ones by allocation of the existing election districts within the proposed representative district.[3] The population of these new representative districts was computed by determining which census enumeration districts they encompassed.[4] Upon analysis of the plaintiffs' submissions the court has found a number of errors that illustrate vividly the extreme difficulty of apportioning a State in a mathematically correct and workable fashion.

Besides some unimportant clerical errors, the plan had one error respecting census figures that could have had substantial impact. The figure 920 was given for one enumeration district when in fact the correct figure is 95. When the constitutionality of a statute depends in relevant part on mathematics such an error is significant.

In the City of Wilmington, two proposed representative districts included the existing 4th election district of the 9th Ward. In other words, there was an overlap. Also, in the City of Wilmington the existing 6th election district of the 9th Ward is not included in any proposed representative district and thereby a substantial number of citizens would be disenfranchised.

In many new representative districts, representative districts broken down from larger districts, census enumeration districts were included when they should have been excluded, or excluded when they should have been included. For example, in the proposed First Representative District in New Castle Hundred parts of enumeration districts 193p, 193s, and 193r were included when they should have been excluded. To the extent they were erroneously included, the population for the proposed district is overstated. The erroneous exclusion or inclusion of enumeration districts in representative districts throws population figures askew. When one vote-one person is the aim, it is impossible to hit the bull's eye with a defectively sighted weapon.

Even if there were no such mistakes there would be a problem of computing the precise population of the new representative districts. This problem is caused by the fact that existing election district lines do not precisely coincide with enumeration district boundaries. Thus, when an election district line cuts through an enumeration district only an estimate can be made of how many people reside on either side of the line.

These problems of arriving at the correct population figures for the new representative districts would not arise if elections were conducted at-large within the hundreds. This follows from the fact that neither election districts nor enumeration districts cross hundred lines. For example, three enumeration districts in part are erroneously included in the proposed First Election District in New Castle Hundred. The effect of such a mistake could be corrected by an election at-large within that Hundred. The Repre-

---

3. An example will clarify this principle. The 6th Representative District, Brandywine Hundred, had allocated to it 4 representatives under the proposed plan. This Representative District was broken down Hundred was comprised of 11 election into 4 representative districts by allocation of existing election districts. The 1st Representative District of Brandywine districts, 1, 5, 7, 8, 18, 23, 25, 26, 34, 37 and 47, all necessarily in that Hundred. The other 3 representative districts in- clude all other election districts in Brandywine Hundred.

4. Census enumeration districts are the official unit of the United States Bureau of Census. They are disclosed on maps of public record. Where election district and census enumeration district lines did not coincide, estimates of population apparently were made by the plaintiffs' experts.

sentative District would be the whole rather than a part of New Castle Hundred, and since those and all other enumeration districts within New Castle Hundred do not cross the hundred lines, the population of the Hundred can be correctly estimated.

The plaintiffs' plan calls for apportioning the Senate strictly on a population basis. It calls for 19 Senators, 4 from the City of Wilmington, 9 from rural New Castle County, 3 from Kent County and 3 from Sussex County. The senatorial districts are created by combining proposed representative districts. Since apportionment of the Senate is based on representative districts, the Senate plan necessarily incorporates all clerical errors made in the House plan; however, it minimizes the exclusion-inclusion problem concerning enumeration districts. A simple example will demonstrate the latter. If representative district "A" erroneously includes enumeration district "X" which should be in representative district "B", the combination of the two into a senatorial district will cancel out the mistake. The fact that larger populations exist in the senatorial districts makes any error in population estimates relatively less damaging. One misstatement as to population was found resulting from the erroneous inclusion of an enumeration district.

CALEB M. WRIGHT, District Judge (concurring).

I join my Brothers BIGGS and LAYTON in holding: (1) Article II, Section 2 is invidiously discriminatory and unconstitutional because of its gross population disparities that cause debasement of voting rights; (2) Article II, Section 2 as amended is invidiously discriminatory and unconstitutional because of its gross population disparities that cause debasement of voting rights; and (3) the House of the General Assembly must be based strictly on population. One vote—one person is the aim.

I agree with my Brother BIGGS' precatory observation that the Senate must be based substantially on population. But all other factors accepted in the majority opinion as justification for deviation from the population principle may be invoked so long as the majority principle is adhered to.

LAYTON, District Judge (concurring in part and dissenting in part).

While concurring in the result reached by the majority, I am unable to agree with certain conclusions, both of law and fact,[1] concerning the Delaware Senate. My views will be briefly stated.

We have just concluded that not only the House of Representatives created by Article 2 Sec. 2 of our Constitution but also the House created by the 1963 Amendment are both invalid because offensive to the equal protection clause of the Federal Constitution. In this I believe we are on firm ground. True, the Federal Supreme Court has not said in so many words that at least one of the branches of a state legislature must be composed of representatives elected strictly on a population basis. Yet the gleanings from certain of the concurring opinions in Baker v. Carr, as well as the expressions of most of the lower courts which have since spoken upon the subject,[2] point implacably in that direction.

But, having declared both the old and the new Lower Houses to be invalidly created under federal constitutional standards, I think it unnecessary to proceed further and declare the State Senate to be invalidly constituted. This is so because the 1963 Amendment to Article 2 Sec. 2 of the Delaware Constitution contains no severability clause and the great weight of authority is to the effect that, in such event, the entire Act must fall. Carter v. Carter Coal Co., 298

[1] My disagreement with certain facts found by the majority plays no important part in this concurring opinion. If the time should arrive when these factual considerations should become relevant, I will cover the subject in a very short memorandum opinion.

[2] For instance see Toombs v. Fortson, 205 F.Supp. 248 (U.S.D.C.N.D.Ga.1962).

U.S. 238, 316, 56 S.Ct. 855, 80 L.Ed. 1160; 2 Southerland Statutory Construction, Sec. 2403.[3]

Moreover, it is a settled principle of judicial approach that a Court should avoid passing on the constitutionality of an Act unless such adjudication is unavoidable. Alma Motor Co. v. Timken-Detroit Axle Co., 329 U.S. 129, 67 S.Ct. 231, 91 L.Ed. 128. Here, because the whole Act falls due to the lack of a severability clause, it becomes unnecessary to go further and consider the validity of the State Senate upon constitutional grounds and, in my judgment, we should avoid doing so. However, because of the unusual nature of these proceedings some broad, general guide lines might be laid down by way of dictum.

Nor can I agree with the conclusions of the majority that the State Senate is invalidly created because (1) the members are elected upon the basis of an equal number from each county rather than substantially upon a population basis, and (2) of the so-called super-senator device whereby voters in the Lower Counties are casting a vote for two senators while those in New Castle are voting for only one.

The majority finds an invidious discrimination in the fact that voters from New Castle County, containing sixty-nine per cent of the State's population, can elect but seven senators while the voters of the two Lower Counties, containing but roughly 15 per cent each of the population, are permitted to elect the same number of senators.

With deference, I can find nothing constitutionally wrong in the make up of a State Legislature composed of a Lower House whose members are elected upon a strict population basis and an Upper House whose members are elected in equal numbers from each County.[4] This is the way our Federal Congress is constituted. True, the analogy between a State Legislature and the Federal Congress is not exact. For one thing, the states are sovereign while the counties are not. More importantly, under the 1963 amendment, an invidious discrimination could well be found to exist on an intra-county basis in the composition of the Senate which would necessitate a redistricting. For instance, the 4th Senatorial District of New Castle County with a population of 64,000 has one senator, while the 7th Senatorial District of the same county has 4,000. Nevertheless, while not exact, the broad analogy is clear and to my mind it is incongruous to hold that a state legislature patterned upon lines precisely similar to those of the federal system is unconstitutional because offensive to the Equal Protection Clause of the Federal Constitution.

My recollection of the record is that there are seven states whose legislatures are patterned exactly on the federal system. So far as I am aware, until recently no one has seriously challenged their validity. The Supreme Court of the United States has never expressed any view on the subject, nor, as far as I have found, have any legal text writers. Nothing in Baker v. Carr suggests that the expression "invidious discrimination" was aimed at a State Senate composed of equal numbers from each county where there also existed a Lower House whose membership was elected on a strict population basis. Rather, I think it should be assumed that these words were directed at situations akin to our 6th

---

3. The rationale underlying the authorities above cited is that a Legislature would never have intended the passage of an Act had it realized that one part was unconstitutional. Certainly it is difficult to imagine that the Delaware Legislature would have passed the 1963 Amendment had it known that the important portion thereof constituting the House of Representatives was invalid.

4. By this I mean that the so-called federal system should be regarded as setting *minimum* standards. No valid reason exists why a county having a very large population should not have more senators than a much smaller county.

Representative District of Brandywine Hundred, having a population of over 58,000, vis-a-vis the 15th Representative District of Blackbird Hundred, in which the population is about 1,600, with the result that a vote for a State Representative in the 6th District of Brandywine is worth about one-thirtieth of a vote in the 15th District of Blackbird Hundred. As a practical matter, no more glaring example of "invidious discrimination" can be found than in general elections where a voter in Nevada, having a population of approximately 285,000, casts a vote for a United States Senator while at the same time a voter in the State of New York, having a population of 16,750,000, casts his vote for a United States Senator.

Since the so-called federal system has withstood 175 years of stress and strain in the national political arena, I can see no valid reason for interfering with the composition of a State Legislature modeled exactly on it.

The majority has also found unconstitutional the 1963 Amendment in so far as it concerns the creation of 2 so-called super senators from each of the two Lower Counties in order to equalize the number of senators from each County at 7. This was a most unfortunate business. Speaking as an individual I would agree with the majority that the result is sheer gerrymandering, but speaking as a judge I am unable to find such an action invalid because, in my view, a Senate composed of an equal number of senators from each county is not an unconstitutionally created body providing the membership of the Lower House is elected on a strict population basis. And simply because the Legislature chose a dubious path by which to arrive at a valid result is not grounds for judicial interference.[5]

In conclusion, I concur in the result reached by the majority in holding that the State Senate as created by the 1963 Amendment to Art. 2 Sec. 2 of the Constitution must fall but upon the single ground that the Amendment, containing no severability clause, the entire Act must fall. With the other conclusions arrived at by the majority I must respectfully disagree.

5. The majority laid emphasis on the fact that the voters in the two Lower Counties will now vote for two state senators while in New Castle County they can vote for only one. This reasoning is not without merit but since the end result is the election of seven senators from each County and because, in my view, the value of a vote for a state senator varies throughout the state because of population differences, I am not persuaded that the result offends the Equal Protection Clause.