taxpayers and voters in the State of Colorado, for themselves and for all other persons similarly situate, Plaintiffs and Petitioners,

v.

The FORTY–THIRD GENERAL ASSEMBLY OF the STATE OF COLORADO; Hon. Stephen L. R. McNichols, as Governor of the State of Colorado; Hon. Tim Armstrong, as Treasurer of the State of Colorado; and Hon. George Baker, as Secretary of State of the State of Colorado, Respondents and Defendants.

Federal Plan for Apportionment, Inc., a Colorado corporation not for profit, Edwin C. Johnson, John C. Vivian, Joseph F. Little, Warwick Downing, Wilber M. Alter, as incorporators and directors thereof and individually and as citizens, residents and taxpayers of the State of Colorado, and John Doe, individually and as a citizen of the State of Colorado, a resident and inhabitant of the City and County of Denver, and a taxpayer of the State of Colorado, on behalf of themselves and for all persons similarly situate, Interveners.

Civ. A. Nos. 7501, 7637.

United States District Court
D. Colorado.

Aug. 10, 1962.

Archie L. LISCO, and all Other Registered Voters of the Denver Metropolitan Area, State of Colorado, Similarly Situated, Petitioners,

v.

Stephen L. R. McNICHOLS as Governor of the State of Colorado, Tim Armstrong as Treasurer of the State of Colorado, George Baker as Secretary of the State of Colorado, the State of Colorado and the General Assembly Thereof, Respondents.

William E. MYRICK, John Christensen, Ed Scott, Gordon Taylor, Henry Allard, Andres Lucas, John L. Kane, William J. Wells, Frank A. Carlson, William Eppinger, Allen L. Williams, Ruth S. Stockton, Kenneth Fenwick, Chester Hoskinson, and Joe B. Lewis, individually and as citizens of the State of Colorado, residents in the Counties of Adams, Arapahoe, and Jefferson, and

Salazar & Delaney, Denver, Colo., for petitioners in Civ. A. No. 7501.

Duke W. Dunbar, Atty. Gen., for the State of Colorado, Frank E. Hickey, Deputy Atty. Gen., and Richard W. Bangert, Asst. Atty. Gen., Denver, Colo., for respondents in Civ. A. No. 7501.

Charles Ginsberg, George Louis Creamer, Denver, Colo., for plaintiffs and petitioners in Civ. A. No. 7637.

Duke W. Dunbar, Atty. Gen., for the State of Colorado, Frank E. Hickey, Deputy Atty. Gen., and Richard W.

Bangert, Asst. Atty. Gen., Denver, Colo., for respondents and defendants in Civ. A. No. 7637.

Charles S. Vigil, and Richard S. Kitchen, Sr., Denver, Colo., for interveners.

Philip J. Carosell, Denver, Colo., amicus curiae.

Before BREITENSTEIN, Circuit Judge, ARRAJ, Chief Judge, and DOYLE, District Judge.

## PER CURIAM.

The above cases were consolidated for trial and disposition. The actions in each instance are on behalf of the plaintiffs for themselves and others similarly situated as taxpayers and qualified voters of the State of Colorado.

In Civil Action No. 7501 it is alleged that the plaintiff is a property owner and a registered voter who resides in Denver. He seeks to compel certain state officers to take specific affirmative action for the purpose of complying with the Fourteenth Amendment to the Constitution of the United States.

In Civil Action No. 7637 the plaintiffs allege that the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States guarantees equality of franchise and that the present legislative apportionment statutes [1] deprive them of the equality of franchise and vote which the Fourteenth Amendment guarantees, whereby these statutes are in conflict therewith; that the statutes as applied to the 1960 federal census reveal gross inequalities and disparities in voting rights; that in some instances the disparities reach a proportion of eight-to-one.

Defendants, the Governor, State Treasurer, Secretary of State and General Assembly of the State of Colorado, have filed answers in which they challenge the jurisdiction of this Court, assert their own immunity from suit, and deny any unconstitutional discriminations.

Certain proponents of an initiated measure have, with the permission of the Court, intervened. From their complaint it appears that they are sponsoring an amendment to the Colorado Constitution which will appear on the ballot in the general election to be held in November, 1962. This measure, according to the allegations of the petition and the evidence adduced at the hearing, would constitutionally establish the senatorial districts and would at the same time increase the membership of the Senate, giving additional senators to more populous districts and would authorize the districting of the House upon a population basis in the year 1963 and after each federal census thereafter. From the petition it also appears that another amendment [2] will appear on the November ballot. This would provide for the districting of both houses by a commission on a population basis, subject to review by the Supreme Court of Colorado. The prayer of interveners is that the Court dismiss these actions, or continue the consolidated cause until after the November election, or declare invalid Section 47 of Article V of the Colorado Constitution which, according to interveners, forbids the subdivision (by the Legislature) of legislative districts.[3]

The Colorado legislature, which is called the General Assembly, is bicameral in character. The Senate has 35 members, elected for four-year staggered terms from 25 senatorial districts which are created by statute.[4] The House of Representatives has 65 members who are elected for two-year terms from 35 districts which are created by statute.[5]

---

1. Sections 63–1–2, 63–1–3 and 63–1–6, C.R.S.1953.

2. No. 8. The amendment sponsored by interveners is No. 7 on the ballot.

3. Since these measures are on the November ballot and could not apply to the upcoming Assembly, and since both require implementation, they would not take effect until 1964.

4. Colorado Constitution, Article V, section 3 and sections 63–1–3, 63–1–4, C.R.S. 1953.

5. Colorado Constitution, Article V, section 3 and section 63–1–6, C.R.S.1953.

The apportionment provision in the Colorado Constitution [6] authorizes the Assembly to create districts and to fix ratios, but requires that this be done with reference to federal or state enumerations. It provides that after each census made as provided by the State, or under the authority of the United States, the General Assembly "shall revise and adjust the apportionment for senators and representatives, on the basis of such enumeration according to ratios to be fixed by law."

In an original proceeding in the Supreme Court of Colorado, In the Matter of Legislative Reapportionment, 374 P. 2d 66, 1962, that court construed the provision of the Constitution of Colorado in respect to the mandate to the Legislature to reapportion following the United States census to not require that apportionment take place in the session immediately following the census. The holding was that the "session next following an enumeration made by the authority of the United States" does not require reapportionment at the session *immediately* following the census report and as applied to the case before the Court held that "such legislation is not mandatory until the Forty-fourth General Assembly convenes."[7]

The federal constitutional question here presented was not considered, but the Court noticed the fact that the mentioned initiative measures will appear on the ballot in November and in recognition of this and of the possible defeat of both measures,[8] the court retained jurisdiction until June 1, 1963, granting leave to reopen at that time if no constitutional amendment or legislative apportionment has meanwhile been adopted.

The record discloses that since Colorado first achieved statehood there has been a modicum of apportionment, either real or purported, and also that there have been several abortive attempts. Since 1876 the General Assembly has been reapportioned, or redistricted, five times: in 1881, 1901, 1913, 1932 and 1953. The 1953 statutes [9] are now in effect. Measures were introduced in the last General Assembly [10] to reapportion with reference to the 1960 federal census report. These measures failed to pass. One initiated reapportionment act has been passed during the period since 1876. This measure was adopted in 1932 but following its adoption the General Assembly passed its own legislative reapportionment act in 1933 which was designed to thwart the operation of the initiated act. This latter act was held by the Colorado Supreme Court to be unconstitutional.[11]

Factual data presented at the trial reveals the existence of gross and glaring disparity in voting strength as between the several representative and senatorial districts. Colorado's present population, determined by the 1960 federal census, is 1,753,947. During the decade from 1950 to 1960 there was a percentage increase amounting to 32.4. During this period the urban areas increased 55.5 per cent. and there was a decrease in the rural areas amounting to 6.6 per cent. The population in 36 of the 63 counties decreased. Some specific examples of the disproportion are here mentioned: The most exaggerated example is in a district (having a single representative) which was shown to have a population of only 7,867 as compared with another representative district (having two representatives) for a population of 127,520 people. Similar disparity exists in the senatorial districts. A single senator represents a district of 127,520 people while another senator has 17,481 people in his district. A senator from one of the seven most populous districts repre-

---

6. Article V, section 45.

7. That is, until January, 1963.

8. In which case the Forty-fourth General Assembly would have to act on the issue. Both of these constitutional amendments would require legislative implementation.

9. Section 63–1–1, supra.

10. The Forty-third.

11. Armstrong v. Mitten, 95 Colo. 425, 37 P.2d 757.

sents on the average 90,309 constituents; a senator from one of the eighteen least populous districts represents on the average 29,013 persons. A representative from one of the seven most populous districts represents on the average 46,342 while a representative from one of the twenty-eight less populous districts represents an average of 15,993 persons. Also noteworthy is the fact that 29.8 per cent. of the 1960 population is capable of electing a majority of the Senate, and 32.1 per cent. of the population is capable of electing a majority in the House of Representatives. Stated differently, it can be said that 562,741 persons elect 33 representatives, a majority, whereas 1,190,306 persons elect 32 representatives, a minority of the House. Similarly, in the Senate 556,912 voters elect 19 of the 35 senators, whereas 1,207,035 elect the remaining 16 senators.

The inevitable effect of the present Apportionment Act [12] has been to develop severe disparities in voting strength with the growth and shift of population. It provides that the ratio for the apportionment of senators shall be one for each senatorial district for the first 19,000 of population and one for each additional 50,000 or fraction over 48,000. The ratio fixed for the House is one representative for the first 8,000 of population and an additional representative for each additional 25,000 or fraction over 22,400 of population. The inevitable consequence of these ratios is the kind of disparity which now exists.

Three questions need to be discussed at this time. They include: *First,* the issue of exercise of jurisdiction; *secondly,* the question whether the disparity in voting strength which is described above sufficiently establishes the unconstitutionality of the districting statutes as applied to these plaintiffs; and *thirdly,* the question whether upon the basis of the present showing—the circumstances before us—we are justified in now granting relief.

I.

THE JURISDICTION QUESTION

The plaintiffs seek "to redress the deprivation, under color of \* \* \* State law \* \* \* of \* \* \* right, privilege or immunity secured by the Constitution of the United States \* \*," and thus they bring themselves within the terms of Title 28 U.S.C. § 1343(3). The action seeks an injunction against enforcement of state statutes upon the ground of their unconstitutionality pursuant to Title 28 U.S.C. § 2281 and requires a three-judge court created pursuant to Section 2284. Baker v. Carr [13] holds that a claim such as the present one, based as it is upon alleged denial of equal protection of the laws arising from the operation of a state statute creating disproportionate legislative representation, constitutes a justiciable issue; that the plaintiffs in such case assert a right cognizable by a federal district court. This decision eliminates any doubt as to jurisdiction of this Court to hear and determine the cause. The argument of the Attorney General that the Colorado Supreme Court has preempted jurisdiction by first hearing the controversy, is without merit in view of the fact that the Supreme Court of Colorado has refrained from even considering the issue of infringement of the plaintiffs' federally-guaranteed constitutional rights. The only question of a jurisdictional nature is whether under the circumstances here presented this Court should as a matter of policy abstain from the *exercise* of jurisdiction. General Investment & Service Corporation v. Wichita Water Company, 10 Cir., 236 F.2d 464, lays down the standards applicable to acceptance or abstinence. It is there said:

"\* \* \* The principle is well established and without dispute that under the rule of comity under our dual system of Government in cases involving state laws, rules or regulations, equitable considerations

---

12. Section 63–1–2.

13. 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663, the decision of the Supreme Court which has given rise to these suits.

will under certain circumstances require federal courts to stay their hands where the parties have an adequate, speedy and complete determination of the controversy in a state tribunal. No cases need be cited to support this statement. It is recognized without exception. The Supreme Court has held that where there is pending in the federal court a case involving the construction of a state law and if one construction will remove the federal question a federal court should stay its hand, retain jurisdiction and relegate the parties to the state court to first seek a construction of the statute. * * * "

See also Alabama Public Service Commission v. Southern Ry. Co., 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002; Corporation Commission of Oklahoma v. Cary, 296 U.S. 452, 56 S.Ct. 300, 80 L.Ed. 324; Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424; Louisiana Power & Light Co. v. City of Thibodaux, 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058.

■ The considerations which demand abstinence are not present in the instant case. Here, the General Assembly of the State of Colorado has repeatedly refused to perform the mandate imposed by the Colorado Constitution to apportion the legislature. The likelihood that the unapportioned General Assembly will ever apportion itself now appears remote. The Supreme Court of Colorado, while retaining jurisdiction of the subject matter of the controversy presented to it, has postponed further consideration of the cause until June, 1963. Under these circumstances, we must conclude that the parties do not, at least at present, have an adequate, speedy and complete remedy apart from that asserted in the case at bar and thus grounds for abstention are at this time lacking.

Nor is there any merit in the contention of the Attorney General that the suit is against the State. The action is against state officers. It seeks injunctive relief against violation of the federal constitution, and thus sovereign immunity is not an issue. Georgia Railroad & Banking Co. v. Redwine, 342 U.S. 299, 72 S.Ct. 321, 96 L.Ed. 335; Harrison v. St. Louis & Santa Fe R. Co., 232 U.S. 318, 34 S.Ct. 333, 58 L.Ed. 621.

## II.

## THE INEQUALITY IN VOTING STRENGTH AS SHOWING UNCONSTITUTIONALITY OF THE DISTRICTING STATUTES

Baker v. Carr does not pass directly on the validity of the apportionment reflected by the Tennessee Districting Statutes. It merely recognizes that allegations of debasement of franchise growing out of disproportionate voting rights tender issues of constitutionality cognizable by federal courts. No guidelines or criteria are laid down for determining the extent or level of disproportion necessary to constitute infringement of the Equal Protection Clause of the Fourteenth Amendment. Thus, the body of case law construing the Equal Protection Clause applies.

■ It is, of course, axiomatic that absolute equality between classes is not essential to validity under the Equal Protection Clause, but a rational basis for the legislative distinctions is necessary.

The test usually employed for determining whether the discrimination is valid or invalid—rational or irrational—is whether the discrimination is "invidious."[14] In his concurring opinion,[15] Mr. Justice Douglas reiterates the "invidious" test as the proper one: (369 U.S. 186, 82 S.Ct. p. 724)

"The traditional test under the Equal Protection Clause has been whether a State has made 'an in-

14. (Among the definitions given by Webster for this somewhat ambiguous term, are: "of an unpleasant nature; hateful; obnoxious.")

15. In Baker v. Carr, supra.

vidious discrimination,' as it does when it selects 'a particular race or nationality for oppressive treatment.' See Skinner v. Oklahoma, 316 U.S. 535, 541 [62 S.Ct. 1110, 1113, 86 L.Ed. 1655]. Universal equality is not the test; there is room for weighting. As we stated in Williamson v. Lee Optical Co., 348 U.S. 483, 489 [75 S.Ct. 461, 465, 99 L.Ed. 563], 'The prohibition of the Equal Protection Clause goes no further than the invidious discrimination.' "

In Moss v. Burkhart, et al., 207 F. Supp. 885, in the United States District Court for the Western District of Oklahoma, the disparity in voting strength between citizens of one county as compared with citizens of another county exceeded in some instances ten-to-one. The Court there found that both branches of the Legislature had consistently disregarded the State Constitution with respect to apportionment.

The Court went on to note that one vote for a representative in one county was equal to fourteen votes for the same office in another county, and eleven votes in still another county. The Court said that the disparity existing in the senatorial districts was even greater. On the basis of this evidence it was concluded that the discrimination was gross and egregious, "and without rational basis or justification in law or fact." The Court proceeded to hold that the apportionment act as it then existed in Oklahoma was "invidiously discriminatory" as against the plaintiff in the action and the class of voters which he represented.[16]

The Supreme Court of Michigan, in Scholle v. Hare, 116 N.W.2d 350, found invidious discrimination in a less aggravated fact setting. It was there said:

"* * * that any law of our State giving some citizens more than twice the votes of other citizens in either the primary or general election would lack constitutional equality so as to void that law. * * * When a legislative apportionment provides districts having more than double the population of others, the constitutional range of discretion is violated. This is not to say that less than such 2 to 1 ratio is constitutionally good. It is to say only that peril ends and disaster occurs when that line is crossed." [17]

At the hearing the plaintiffs offered exhibits showing the population of the state, the counties, and the senatorial and representative districts and rested their case on the proposition that such exhibits show such a disparity in representation as to establish invidious discrimination and to destroy any claim of rationality in the apportionment of the legislature. The defendants assert that the legislative districts are justified by topographic, geographic, historical and economic factors which have been applied in a rational manner but they presented no evidence to sustain their position. The interveners called two witnesses, each of whom recognized a malapportionment of the House, and with general statements defended the apportionment of the Senate. Their testimony with regard to the Senate is weakened by their own initiated proposal which makes changes in the apportionment of that body. In effect, we are left with a situation where one side says that the population figures show invidious discrimination and the other side says that the disparities so shown are not sufficient to overthrow the presumption of constitutionality.

We recognize that a statute is presumed constitutional, and that he who attacks the constitutionality of a statute bears a heavy burden.[18] The population statistics presented by plaintiffs and challenged by no one, show the dis-

---

16. Final judgment has been postponed until April, 1963 to give the Oklahoma legislature a further opportunity to reapportion.

17. Although the Michigan Court held the Senate districting system unconstitu-

tional, the Supreme Court stayed execution on the order enjoining the primary election.

18. Fletcher v. Peck, 6 Cranch 87, 10 U.S. 87, 3 L.Ed. 162; Trustees of Dartmouth College v. Woodward, 4 Wheat. 518, 17

478

parities we have heretofore noted. They are of sufficient magnitude to make out a *prima facie* case of invidious discrimination which rebuts the presumption. Accordingly, the defendants were obliged to show that there exists some rational basis for these disparities.

██ To sustain the rationality of the present districting of the Colorado General Assembly we are left with those facts which may be judicially noticed. We know that Colorado is a large state having two counties with an area of over 4,000 square miles and a number of counties of more than 2,000 square miles in size. We know that the east half of the state is a land of plains and the west half a land of mountains. The population is now concentrated in the metropolitan centers of Denver, Pueblo and Colorado Springs, all located in a narrow strip east of the Continental Divide. The economic interests of the farmers and the miners, the stock raisers and the oil producers, the merchants and the consumers, the employers and the employees, industry and recreation, the mountains and the plains, the large cities and the small towns, have many differences. The Colorado statutes reflect that traditionally the districting of the legislature has favored certain areas with a great emphasis on the mining counties which was changed, at least partially, by the 1932, initiated measure which increased the representation of the eastern farming counties. We know too, that in the last twenty years the population has become more and more concentrated in the metropolitan areas.

These matters of general knowledge may justify disparities in legislative districts. They do not, of themselves, sustain the rationality of the legislative districts as they now exist. Reliance on generalities is misplaced when a case must be decided on the basis of specific situations.

██ We are asked to stay our hands until the State has acted through its machinery. The principle that there should be a minimum of judicial intrusion by federal courts into the governmental affairs of a state needs no amplification. We are aware that the integrity and independence of state governments must be preserved and that the states must have the widest possible latitude in the conduct of their internal affairs and in the solution of their own problems. Of comparable importance is the protection of the individual in the enjoyment of his constitutional rights and privileges. The sensitive balance which must be maintained between the protection of individual rights and the preservation of state integrity cautions against precipitate action.

### III.

### WHETHER A DECREE SHOULD BE ENTERED NOW

There are additional considerations which bear on whether a decree should be entered at this time adjudicating the constitutionality of the Colorado districting statutes and decreeing a scheme of apportionment in the event of a holding of unconstitutionality.

The record before us is, as shown above, inadequate. The trial of the case was completed in one day and the only testimony offered was that on behalf of the interveners. Although plaintiffs offered a number of exhibits showing the extent of voter strength disproportion, there was no evidence describing possible plans for remedying invidious discrimination should the same be found. Considering the lack of substantial evidence of this character, it would be presumptuous for this Court to devise a plan on its own initiative.

*Secondly*, in view of the magnitude of the task, the time is wholly inadequate. The political parties have now held their assemblies at which candidates have been designated to appear on the ballot at the primary election which is scheduled to take place on September 11, 1962. Any positive orders which we might enter at this time would likely

U.S. 518, 4 L.Ed. 629; Powell v. Pennsylvania, 127 U.S. 678, 8 S.Ct. 992, 32 L.Ed. 253; Nicol v. Ames, 173 U.S. 509,

19 S.Ct. 522, 43 L.Ed. 786; Flemming v. Nestor, 363 U.S. 603, 80 S.Ct. 1367, 4 L.Ed.2d 1435.

interfere with this election and would have a disruptive effect. The time available is so insufficient as to render it impractical, if not impossible, to now deal with the merits of the case.

In the light of the foregoing, we conclude that final adjudication should be postponed until a further hearing has been held on all issues.

We further conclude that the case presented is not one for temporary injunctive relief and that there should be no impediment to the orderly conduct of the election or interference with the electorate in the free expression of their opinions on the initiated measures at the coming election; accordingly, it is

ORDERED that the cause be continued until on or about November 15, 1962. On or about that date a pretrial hearing shall be held, and soon thereafter a further trial on the merits. It is

FURTHER ORDERED that all motions for temporary injunctions be denied.

Notices of the exact date and hour of further hearings will be furnished at a later date.