Joseph GERMANO et al., Plaintiffs,

v.

Otto KERNER, as Governor of the State of Illinois and Chairman of the State Electoral Board, Charles F. Carpentier, as Secretary of the State of Illinois and Secretary of the State Electoral Board, William G. Clark, as Attorney General of the State of Illinois and member of the State Electoral Board, William J. Scott, as Treasurer of the State of Illinois and member of the State Electoral Board, and Michael J. Howlett, as Auditor of Public Accounts of the State of Illinois and member of the State Electoral Board of Illinois, Defendants,

and

Clyde Beals et al., Defendants-Intervenors.

Civ. A. No. 63 C 291.

United States District Court
N. D. Illinois, E. D.

July 30, 1963.

Austin, J., dissented.

Bernard Kleinman, Kleinman, Cornfield & Feldman, Chicago, Ill., Asher, Gubbins & Segall, Chicago, Ill., for plaintiffs.

William G. Clark, Atty. Gen., Chicago, Ill., Howard Robinson, Sidley, Austin, Burgess & Smith, Chicago, Ill., for defendant.

Before SCHNACKENBERG, Circuit Judge, CAMPBELL, Chief Judge, and AUSTIN, District Judge.

CAMPBELL, Chief Judge.

In the lexicon of the legal profession this is another apportionment case. Plaintiffs have sought and appropriately been granted the present three-judge court. Title 28 § 2281 and § 2284.

The instant complaint, which for all practical purposes is a prototype of the complaint in Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663, alleges that the plaintiffs, citizens, residents and qualified voters of the State of Illinois, have been denied equal protection and due process of the law by a 1954 Amendment to the Constitution of Illinois (Now Art. IV Section 6 of the Illinois Constitution, S.H.A.) which authorized a certain 1955 Act of the Illinois General Assembly (Ill.Rev.Stat.1961, c. 46, § 158–1 et seq.) which, in turn, created the state's senatorial districts. More specifically, the complaint alleges that the method of electing state senators, which is set out in the above Act, is based primarily on a geographical basis—rather, than on what plaintiffs allege is the only proper basis— population. (The lower house of the Illinois bicameral legislature is elected, pursuant to the same Amendment and Act, primarily on a population basis.)

The result, plaintiffs contend, is a grossly malapportioned state senate, an obvious debasement and diminution in the value of their vote and an invidious discrimination in violation of the Fourteenth Amendment of the Constitution of the United States.

Members of the Illinois Agricultural Association, by motion, sought and were granted leave to intervene in this action. They oppose the plaintiffs' complaint.

The plaintiffs' prayer for relief is best summarized by their brief which states their requests as follows:

(a) "That Article IV, Section 6 of the Constitution of Illinois and the implementing statutes * * (be declared) void and invalid. * * * "

(b) That the defendants be restrained "from certifying any candidates, proclaiming any election results, (etc.) * * * pursuant to Article IV, Section 6 of the Constitution of Illinois * * or of the statutes in implementation thereof * * * for the office of senator to the General Assembly. * * * "

(c) That this Court "retain jurisdiction of this cause * * * until such time as the senate of the State of Illinois, freed from the fetters imposed by the Constitutional provisions invalidated by this Court has been reapportioned and redistricted to insure all voters * * * the rights guaranteed them by the Constitution of the United States."

(d) That this Court "grant such other and further relief as to this Court may seem just and proper."

Defendants have filed a motion to dismiss predicated upon two alternative grounds, 1) lack of jurisdiction and 2) failure to state a claim upon which relief can be granted. Defendants also submitted an alternative motion asking the court to 3) forbear or abstain from tak-

ing further action on the case based on the doctrine of "Abstention". These motions were briefed by the parties and oral argument was heard by the court. On the basis of Baker v. Carr, W.M.C.A. Inc. v. Simon, 370 U.S. 190, 82 S.Ct. 1234, 8 L.Ed.2d 430 and Scholle v. Hare, 369 U.S. 429, 82 S.Ct. 910, 8 L.Ed.2d 1 defendants' motions were denied.

At the suggestion of the Court and with the consent of the parties it was agreed that the case could properly be tried on the merits based on the facts well pleaded in the plaintiffs' complaint. Defendants, in the language of the common law, are therefore by their consent filed herein demurring to the complaint. In accordance with the Federal Rules of Civil Procedure we consider this as a motion for judgment on the pleadings in accordance with Rule 12(c), Title 28.

Generally the complaint, the only pleading before us, in addition to reviewing historical background outlines the present Illinois pattern for senate apportionment and includes a breakdown of the senate districts as to population and square mile area coverage.

Considering the complaint on its merits, necessarily, all of the facts well pleaded therein are accepted—however, the many conclusions of law also enwoven within the complaint are of course not accepted, but on the contrary, form the crux of the issues presently before the Court.

The facts show a clear picture of a bicameral legislature, similar in structure, if not necessarily in form or election method, to that of the federal government, the English Parliament and all of our individual sister states except Nebraska, which uniquely functions under a unicameral legislative body. Similarity continues with most of the above bicameral legislatures in that Illinois provides for the election of the members of one house, in this case the lower house, on the basis of population. What is here sought and intended is a realization of a one voter-one vote ratio. (In Illinois each voter votes for three members of the lower house.) Decennial reapportionment is provided to take into account possible shifts in the state's population. Plaintiffs do not raise issue with this plan, for that matter they contend that this plan or method of electing legislators is the only constitutionally acceptable one, and that any deviation therefrom by the use of weighted voting systems results in an invidious discrimination and violation of the Constitution.

The upper house or senate, on the other hand, is not elected on the basis of population. The 1955 Act created 58 senatorial districts on an arbitrary, clearly political compromise motivated, area basis. The result is obvious, the one voter-one vote ratio is neither sought or desired and of course is not attained. The figures, graphs and statistics set forth in plaintiffs' complaint correctly and unequivocally depict a clear picture of population disparities in state senatorial districts. Dividing the state's population, 10,081,133, by the number of senatorial districts, 58, we find that if such districts were to be based on population, there should be 173,812 voters (using this term as being synonymous with population for purposes of the present illustration) in each district. Such is not the case. By way of illustration the average district in the City of Chicago has some 196,994 voters; the remainder of Cook County excluding Chicago averages 263,000 voters per district. Moreover, within Chicago itself, as well as "down-state", discrepancies exist in relative district population figures. And finally, unlike the lower house no reapportionment or redistricting is provided for.

Plaintiffs' complaint alleges that the above discriminates against certain voters, particularly against those such as themselves who live in metropolitan as opposed to rural areas. This fact can hardly be denied. However, I am of the opinion that these conditions do not constitute, as contended by plaintiffs' complaint, even an unreasonable much less an invidious discrimination as prohibited by the Fourteenth Amendment.

We do not have before us any allegations that the State's Constitution or statutory provisions are not being complied with. We do not have before us and are not considering a situation wherein both houses of a bicameral legislature are elected on the basis of a weighted voting system which ignores population. We are not, in my considered judgment, considering an area apportionment system which creates a per voter-per vote ratio that would shock the conscience of the court. Nor are we considering, there being no such allegation in the complaint, a system gerrymandering the senatorial districts according to race, ethnic background or economic position. (See Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110). On the other hand we are considering a plan intended to somewhat counter-balance the relative political powers of the urban and agrarian voters. We are considering a plan intended to assure each group control in only one house of a bicameral legislature.

The actions of the State of Illinois are in conformity with the provisions of its Constitutional Amendment of 1954 and Act of 1955, which provide for a bicameral legislature wherein one house is truly based on population, vote for vote, with provisions for periodic changes to correspond to population changes, and the other house is based on the geographical locations of the voters who elect its members. This is precisely what the Amendment and Act here questioned were intended to do for Illinois. In this regard plaintiffs call the court's attention to wording of the 1954 Amendment which calls for the creating of senatorial districts based primarily upon area considerations. After showing major discrepancies to exist generally between Chicago and "downstate", in the number of square miles constituting the districts (7.3 square miles in the 23rd district which covers the least area, and 2,199 square miles in the 40th district which covers the greatest area), they suggest to the court that area, no less population,

was not used as a basis in drawing the districts. This unfair interpretation of the word area is without merit, it being legal folly to contend that the Amendment intended to equate representation in the senate in proportion to square miles. Such a view would have our system of government retrogressing to a feudal arrangement where land ownership was synonymous with political power.

Prior to the 1954 Amendment and the 1955 Act, and since 1901, neither Illinois legislative house was reapportioned, notwithstanding the existence of provisions permitting, indeed calling for, such action. Dissatisfaction existed and a political solution was necessary. Unlike many of its sister states, Illinois took affirmative action. A solution took the form of this Amendment and the ensuing Act, the former being ratified by 87% of the voters of metropolitan Cook County in a public referendum. The Act clearly was a compromise in order to settle, apparently satisfactorily to both sides, some legislative equalization between voters in agrarian and rural areas on the one hand and urban or large city populations on the other. In adopting this political and practical compromise, Illinois has done no more and no less in my opinion than to follow the example of the founding fathers in the Constitutional Convention at Philadelphia. Having recognized the necessity for protecting minority voting rights and local sovereignty, the founding fathers adopted the system still in use providing for the election of our bicameral Congress. As in Illinois, election to the upper house is based on geographical area, or if you will, a weighted voting system. Election to the lower house is based on population similar to Illinois. Should that which is deemed proper when observed in the presence of the federal government be suddenly deemed improper when associated with a sovereign state? Must the subject be more royal than the king? Must the State be more democratic than the United States?

Necessarily, I am well aware of atypical distinctions between the federal government and the individual states. My reliance on this analogy is limited somewhat by these nuances. The states as sovereign pre-existing smaller units created the larger unit, the federal government. Contrastingly, in apportionment cases we view the states in a different perspective; as the larger unit creating the smaller. And further, the smaller unit in apportionment cases lacks the element of sovereignty possessed by the states in their relationship to the federal government. However, these distinctions do not render for naught this analogy. In both instances the purposes were similar, to protect minority rights and check unopposed majority control. The methods selected to achieve the desired purposes are similar, and by and large the results have been similar.

I might further observe that if as plaintiffs contend, both houses of a bicameral legislature were required to be elected on a similar population apportionment basis, one would be justified in seriously questioning the need or the wisdom in retaining a bicameral as opposed to a unicameral legislature.

I am not unmindful of the many cases wherein courts, for the most part three-judge federal courts similar to this, have held particular state apportionment methods invidiously discriminatory. Davis v. Synhorst, D.C., 217 F.Supp. 492; Sincock v. Duffy, D.C., 215 F.Supp. 169; Mann v. Davis, D.C., 213 F.Supp. 577; Thigpen v. Meyers, D.C., 211 F.Supp. 826; Sims v. Frink, D.C., 208 F.Supp. 431; Moss v. Burkart, D.C., 207 F.Supp. 885; Toombs v. Fortson, D.C., 205 F. Supp. 248; Scholle v. Hare, 367 Mich. 176, 116 N.W.2d 350. However, assuming *arguendo* their ability better to prognosticate subsequent and eventual action to be taken by the Supreme Court on this issue, in none of these cases were the facts identical, or in the semantics of the law "on all fours", with those of the instant case. For that matter in all but Scholle both houses were allegedly malapportioned. Moreover, in Toombs the

court, although holding the apportionment method of the Georgia General Assembly to invidiously discriminate, (both houses were apportioned on an area basis) indicated its belief that only one house of a bicameral legislature need be elected on the basis of population apportionment.

My opinion on this issue is not without judicial support. Most recently, on June 12, 1963, a three-judge court sitting in the Southern District of Ohio decided Nolan v. Rhodes, D.C., 218 F.Supp. 953. In considering the Ohio apportionment scheme the court had before it a situation not too unlike that in Illinois, distinguishable in that the Ohio lower not the upper house was apportioned on an area basis. As in Illinois one house (the senate in Ohio) was apportioned on the basis of population. The court rejected plaintiffs' contention that both houses of a bicameral legislature must be apportioned on a strict population basis and held that Ohio representative districting did not constitute an invidious discrimination. In this regard see also Clark v. Carter, U.S. D.C.Ky., 218 F.Supp. 448; Sobel v. Adams, D.C., 214 F.Supp. 811; Wright v. Rockefeller, D.C., 211 F.Supp. 460; Jackman v. Bodine, 78 N.J.Super. 414, 188 A. 2d 642; Maryland Committee For Fair Representation v. Tawes, 229 Md. 406, 184 A.2d 715, which is very similar factually to the instant case; also Donovan v. Holzman, 8 Ill.2d 87, 132 N.E.2d 501 which had occasion to consider the same apportionment act presently before the court. See also: Lisco v. McNichols, D.C., 208 F.Supp. 471; Westberry v. Vandiver, D.C., 206 F.Supp. 276; State of Wisconsin v. Zimmerman, D.C., 205 F. Supp. 183; Mikell v. Rousseau, 123 Vt. 139, 183 A.2d 817.

Needless to say the divergent views found in the above cited opinions are a clear indication that this general issue has not yet been decided by the Supreme Court. Such a decision should be forthcoming in the relatively near future as most of the cases cited in this memorandum (I would hope and anticipate that this case will join them) are presently

pending before the Court. However, I am of the opinion that a comparison of the Supreme Court opinions somewhat related to this issue does support the position I here have taken. In Baker v. Carr, the Court held that jurisdiction existed and that a complaint alleging the unconstitutionality of state legislative apportionment practice could state a valid claim of action. In W.M.C.A. v. Simon and Scholle v. Hare, the Court reaffirmed and reiterated this position. However, the Court did not hold that a system of apportionment not based solely on population would constitute *per se* invidious discrimination. Moreover, the Court did not have before it a complaint admitting that one house of a bicameral legislature was in fact apportioned on a population basis. As I interpret Baker v. Carr, the Court, limited by the narrow scope of the issues before it, instructed lower courts to scrutinize and review apportionment methods presented to them and in so doing determine the existence or non-existence of a rational policy or plan as distinct from an irrational, no-policy, invidiously discriminatory system. In this regard, Justice Brennan writing for the Court majority stated 369 U.S. at p. 226, 82 S.Ct. at pp. 714–715, 7 L.Ed.2d 663:

> "Judicial standards under the Equal Protection Clause are well developed and familiar, and it has been open to courts since the enactment of the Fourteenth Amendment to determine, if on the particular facts they must, that a discrimination reflects *no* policy, but simply arbitrary and capricious action."

Also, 369 U.S. at page 265, 82 S.Ct. at 736–737, 7 L.Ed.2d 663, Justice Stewart in his concurring opinion states:

> "The Court does not say or imply that there is anything in the Federal Constitution to prevent a State acting not irrationally from choosing any electoral legislative structure it thinks best suited to the interests, temper and customs of its people".

In my opinion the Illinois system wherein one house of a bicameral legislature is not apportioned on a population basis, but rather, is apportioned with a definite and not irrational or capricious intention in mind of balancing the divergent political interests of the state's large metropolitan area against the interests of the primarily rural "downstate" area, does present a reasonable plan. Further, this plan does in fact permit a reasonable, not a capricious or absurd, check upon the political power of the largely populated urban area. The term check as used in the preceding sentence is not synonymous with control.

The Supreme Court in Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821, on the basis of the facts there before it, although inapposite to the present issue, goes to great pains to make this distinction clear. In Gray v. Sanders the Court unequivocally held that in elections (including primary nominating elections where controlled by the state) within an already determined geographical unit, in that case a state, be the elections for federal or state wide offices *other than legislators,* all forms of "weighted voting" are *per se* unconstitutional. In such elections all who participate must have an equal vote; one person-one vote. Why would the Court emphatically emphasize and re-emphasize the fact that the law of the case did not necessarily apply to bicameral legislatures if in fact it intended to include such bicameral legislatures within the ambit of the one person-one vote requirement?

The complaint fails to plead sufficient facts to justify this court in finding that the Illinois method of apportioning its senatorial districts, considered as it must be together with the method for apportioning lower house districts, invidiously discriminates against the plaintiffs.

The complaint is dismissed at plaintiffs' costs.

AUSTIN, J., dissents.

SCHNACKENBERG, Circuit Judge.

It is my purpose to concur in the opinion which Judge Campbell presents and

to express some additional views on the subject of this case.

Based on the facts set forth in the complaint, plaintiffs attack the 1954 amendment to article IV of the constitution of Illinois, which provides for the apportionment of the state senate districts on other than a population standard, as distinguished from the house of representatives, which continues to be chosen on a population basis.

According to the 1960 federal census, 5,129,725 people—somewhat more than half the 10,081,158 total population of the state—reside in the great metropolitan area of Cook County. The remaining 4,951,433 people of Illinois are spread over the 101 "downstate" counties (i. e., those other than Cook).

Prior to the adoption of the 1954 amendment, the last preceding reapportionment of the legislative districts of the state of Illinois, from which representatives as well as senators were elected, took place in 1901. Although the Illinois constitution of 1870, which was in effect during all of the intervening time, required the general assembly following each decennial federal census to reapportion the state according to population, that duty was not performed. The result was that, while Cook county, containing Chicago and its suburbs, grew in population which finally exceeded that of the rest of the state, it remained underrepresented in both houses of the legislature.

Cook county, with its highly concentrated population, had social, economic and political interest different from those of the sparsely populated downstate areas. These interests inevitably at times conflicted in the legislative process. The long existing numerical dominance of the downstate area in both houses of

the legislature and the inexcusable failure to reapportion the legislative districts for nearly a half century resulted only in a stalemate in all efforts to resolve this injustice. This conflict in interests was brought to a direct issue on several occasions when efforts were made in the legislature itself in 1923, 1925 and 1929, to comply with the 1870 constitutional provisions.[1] On each of these occasions, a resolution was introduced in the house of representatives providing for the appointment of a commission to prepare a reapportionment bill in accordance with the state constitution. Each such resolution on a roll call was defeated, the favorable votes coming almost entirely from Cook county and the adverse votes from downstate.

In a suit filed by a citizen for a writ of mandamus to compel the members of the general assembly to apportion the state in accordance with the aforesaid constitutional provision, Fergus v. Marks, 321 Ill. 510, 152 N.E. 557, 46 A.L. R. 960 (1926), the Illinois Supreme Court held that the judicial department had no control over the matter, which had been solely confided by the constitution to the general assembly, and denied the relief, although it held in a similar suit, decided in 1929, Fergus v. Kinney, 333 Ill. 437, 164 N.E. 665, that the duty to reapportion imposed by the constitution is mandatory.

It is thus apparent that, long before 1954, this problem called for a compromise solution to the end that neither area would be dominant over the other. It was to attain this objective that the people of Illinois adopted the 1954 constitutional amendment and that, pursuant thereto, the state was redistricted in 1955, 30 of the 59 representative districts being placed in Cook county,[2] while, in

1. In this connection we take judicial notice of the house journals of the Illinois House of Representatives. House joint resolutions were introduced providing for the appointment of a joint committee to make an apportionment plan, in accordance with article IV, section 6 of the Illinois constitution of 1870. 1923 House Journal 51, 163; 1925 House Journal 44, 70, 71, 88; 1929 House Journal 166, 433, 477, 478.

2. Provision was made that the house shall be redistricted according to population each decade, following the census. In the event the general assembly fails to ac-

the senate, downstate residents were granted a check upon the political power of the Cook county metropolitan area.[3]

In considering the 1954 amendment, the holding in MacDougall v. Green, 335 U.S. 281, 69 S.Ct. 1, 93 L.Ed. 3 (1948) is apposite, because there the court upheld an Illinois law, which, like the 1954 amendment, provided a check upon the political dominance of the most populous area of the state. At 283, of 335 U.S., at 2 of 69 S.Ct., 93 L.Ed. 3, the court said:

" * * * To assume that political power is a function exclusively of numbers is to disregard the practicalities of government. Thus, the Constitution protects the interests of the smaller against the greater by giving in the Senate entirely unequal representation to populations. It would be strange indeed, and doctrinaire, for this Court, applying such broad constitutional concepts as due process and equal protection of the laws, to deny a State the power to assure a proper diffusion of political initiative as between its thinly populated counties and those having concentrated masses, in view of the fact that the latter have practical opportunities for exerting their political weight at the polls not available to the former. The Constitution—a practical instrument of government—makes no such demands on the States. * * *"

MacDougall v. Green has not been overruled by Gray v. Sanders, 372 U.S. 368, at 376, 378, 83 S.Ct. 801, at 806, 807, 9 L.Ed.2d 821 (1963) where the court, actually disclaimed any intention of ruling on a question such as we have before us, which it states as "whether a State may have one house chosen without regard to population. * * *", and, made

clear that it was in that case not concerned with the composition of the state legislature, and the Gray was "only a voting case".

On the other hand, MacDougall was cited with approval by Mr. Justice Brennan, for the court, in Baker v. Carr, 369 U.S. 186, 203, 207, 82 S.Ct. 691, at 702–703, 704–705, (1962) and by Mr. Justice Clark, 369 U.S. at 251, 82 S.Ct. at 728, 7 L.Ed.2d 663 and Mr. Justice Stewart, 369 U.S. at 265, 82 S.Ct. at 736–737, 9 L.Ed.2d 663, who concurred.

It is apparent that the 1954 amendment now under attack reflects a rational policy fully consistent with the principles of the equal protection clause, to which the court referred in Baker v. Carr, supra, 369 U.S. at 226, 82 S.Ct. at 714–715, 7 L.Ed.2d 663:

" * * * Judicial standards under the Equal Protection Clause are well developed and familiar, and it has been open to courts since the enactment of the Fourteenth Amendment to determine, if on the particular facts they must, that a discrimination reflects *no* policy, but simply arbitrary and capricious action."

The apportionment plan now under attack reflects a definite, reasoned policy. It is neither arbitrary nor capricious. Its policy has been recognized by the Illinois Supreme Court in Donovan v. Holzman, 8 Ill.2d 87, at 91, 132 N.E.2d 501 (1956), which described the result as "a satisfactory compromise between Cook County and downstate Illinois".

That court, 8 Ill.2d at 92, 132 N.E.2d at 504, quoted from an official statutory explanation of the amendment given to the voters prior to election day:

"This amendment follows the system which the founding fathers

complish redistricting, the power and duty to do so devolves upon a special *ad hoc* commission (Art. IV, § 8).

3. Both article IV, § 6 and article IV, § 7 also recognize a division within Cook county between the city of Chicago (1960

population 3,550,404) and the suburban communities. Of 30 representative districts allotted to Cook county in 1955, 23 were placed in Chicago. Of the 24 senatorial districts allotted to Cook county, 18 are in Chicago.

wrote into the national constitution and which has proved so successful in the case of Congress. There the House of Representatives is based on popular representation and the Senate is based on a form of area representation, similar in principle to what is proposed for Illinois."

An attempt is made to differentiate between the conditions which produced as a compromise the 1954 Illinois provision and the conditions which produced the compromise leading to the provision for election of members of the United States Senate in disregard of the population of their states. However, both the plan for the choice of United States senators regardless of population and the 1954 plan in Illinois were the results of compromises. The compromises in both cases were actual and necessary. If the representation of each state by two senators in the United States Senate is valid because based on a compromise, then the provision for election of state senators in Illinois based upon a compromise is likewise valid.

The judicial verity that supported the wisdom of our forefathers in establishing the United States Senate on a territorial basis as a compromise with the principle of representation based upon population is sound and is relevant to our consideration of the 1954 compromise in Illinois, which similarly settled its metropolitan versus downstate stalemate by creating a senate on a territorial basis. Moreover, Illinois has continued to adhere to the pattern of a republican form of government. The accomplishment of this objective complies with the guarantee of the federal constitution that each state shall have a republican form of government.[4] Moreover, it is interesting to note that the Illinois compromise was chosen by the votes of the electors in Cook county as well as in the downstate areas.

At this point, it is well to remember that legislative authority, both national and state, is involved when new states are admitted to the federal union. While undoubtedly the drafting of a plan of apportionment is a state legislative function, it is the constitutional duty of congress, when admitting states to the union, to determine whether they have governments republican in form in compliance with the federal constitution. It is therefore significant, as pointed out by intervenors, that, when Hawaii and Alaska were recently admitted, Congress by resolutions approved and "found to be republican in form and in conformity with the Constitution of the United States" the constitutions of those states, although senatorial districts of widely variant populations were created. For example, in Hawaii, 500,409 persons were given 10 senators, while 132,363 were given 15 senators, according to the 1960 census.[5] The Hawaii constitution approved by Congress is printed as Appendix A to S.Rep.No. 80, 86th Cong., 1st Sess. (1959). In Alaska, one of the senatorial districts has a population of 5,705, while another has 87,748. The Alaska constitution approved by Congress is printed as Appendix A to H.R.Rep.No. 624, 85th Cong., 2d Sess. (1958).

For all of these reasons I concur in Judge Campbell's opinion.

AUSTIN, District Judge (dissent).

Because great weight and stress has been given to the fact that the challenged 1954 constitutional amendment received approval of the Illinois electorate by a substantial majority less than nine years ago, a more thorough understanding of the legislative history which preceded that choice is necessary.

4. Art. IV, § 4, U.S.Const.

5. All population figures in this paragraph have been furnished to us in the brief of intervenors. Their correctness has not been questioned by any counsel.

The original constitutions of thirty-six States, including Illinois, provided for the election of both Houses of their bicameral legislatures on a vote for vote basis. The three constitutions of Illinois prior to 1954 provided for selection of both Houses on a population basis and further provided for reapportionment each decade, based on the decennial census, to preserve the vote for vote principle. For ninety years, while the rural areas of the State, in the 101 counties outside of Cook, contained a majority of the voters, there was assiduous compliance with the constitutional requirement of reapportionment. During that period, the minority urban voters made no request for control of one of the legislative Houses to "protect our minority interests", nor did the rural majority ever suggest that such a provision would be fair and just.

As the 20th Century started, a population trend developed which threatened rural control of the legislature. To meet that threat and abate it, the rural legislators in both Houses wilfully and illegally for more than forty years forswore their constitutional duty to reapportion the State contrary to what they had done before their control was threatened.

Although bills to reapportion, pursuant to the constitution, were introduced during that period, at most sessions of the legislature, the rural oligarchy, voting as a block, defeated each one. Repeated but fruitless appeals were made to both State and Federal Courts to compel compliance with the constitution. In this atmosphere of frustration and hopelessness the present constitutional amendment was conceived. In effect, the ultimatum of the feudal barons to the urban majority was this: We will restore to you one-half of the constitutional rights we have withheld for forty years if you will abandon forever the other half of those rights. It was with a spirit of resignation, with the gun to their head, that the weary majority capitulated. Although constitutionally entitled to a whole loaf, they accepted a crumb.

This is the "compromise" solution alluded to in the opinions of my colleagues.

This constitutional amendment fails to provide for reapportionment of the Senatorial Districts, despite future population changes, and forever cedes to the rural minority 60% of the Senate, and with it, the attendant veto power over the will of the majority. It constitutes in my opinion invidious discrimination. The implementing legislation redistricting the State's Senatorial Districts, is even less defensible. At the present time, less than 29% of the voters of Illinois elect a majority of the Senate.

Distinction is sought to be made on the ground that the acknowledged discrimination is not based on race, ethnic background, or economic position, and therefore, is not invidious. However, the test of invidious discrimination is not limited to these factors alone.

In Donovan v. Holzman, 8 Ill.2d 87, 97, 132 N.E.2d 501, 507 (1956), the Illinois Supreme Court said:

"It is clear that the purpose of separate senatorial and representative districts was to insure popular representation in one house, and insure downstate control in the other."

In regard to the present Senatorial apportionment, I find most apt the words of Justice Clark in Baker v. Carr, 369 U.S. 186, 258, 82 S.Ct. 691, 732, 7 L.Ed. 2d 663, (1961):

"If present representation has a policy at all, it is to maintain the status quo of invidious discrimination at any cost."

As has heretofore been indicated, less than 29% of the population of Illinois can elect a majority of the Senate. In Sims v. Frink, 208 F.Supp. 431, (D.C.Ala. 1962), the Court held that a plan of Senate apportionment, where only 19.4% of the electorate could elect the majority of the Senators, was invidiously discriminatory. In Moss v. Burkhart, 207 F.Supp. 885, (D.C.Okla.1962), invidious discrimination was found where 26% of the people elected the majority of the

lower House of 20% elected a majority in the Senate. After remand of Baker v. Carr, supra, a proposed new Tennessee plan of Senatorial apportionment, more representative than is presently provided in Illinois, was held to be "utterly arbitrary and lacking in rationality. Its only consistent pattern is one of invidious discrimination." [206 F.Supp. 341, 348 (D.C.Tenn.1962)] In Thigpen v. Meyers, 211 F.Supp. 826 (D.C.Wash.1962), the election of a majority of the State Senators by 35.6% of the State's population was held to be invidiously discriminatory. In Scholle v. Hare, 367 Mich. 176, 116 N.W.2d 350, the election of a majority of the Senate by 28% of the people was deemed invidious.

Courts in other reapportionment cases have held that the fact that an electorate has recently rejected measures to reapportion the legislature according to population or approved a plan nearly identical to that adopted by the Illinois voters in 1954, is not a factor to be considered in determining whether invidious discrimination exists. In the Thigpen case, supra, the voters of Washington, twenty-four days before the court's ruling, defeated an initiative measure which sought to redistrict the legislature according to population. In commenting on this, the court stated [211 F.Supp. at 832]:

"We are asked to decline jurisdiction because the voters of Washington in the general election of November 6, 1962, defeated an initiative measure designed to reapportion the Washington Legislature according to population revealed by the Federal census of 1960. Our answer is concise and direct. We have no way of knowing whether the measure was defeated because a majority did not desire reapportionment or whether they didn't approve of the proposed method or whether they didn't understand it * * * or whether the opponents were better organized than the proponents. It makes no difference.

The inalienable constitutional right of equal protection cannot be made to depend upon the will of the majority."

Likewise, in the Scholle case, supra, the Michigan voters in 1952 rejected a constitutional amendment calling for equal representation in the Senate and had at the same election adopted a plan very similar to that which Illinois voters approved in 1954.

The need or wisdom in retaining a bicameral legislature is questioned if both Houses are elected on a population apportionment basis. The best answer to that is contained in a publication of the Twentieth Century Fund, entitled "One Man—One Vote", collating the views of fifteen constitutional law experts and political scientists as expressed at a conference held in New York City on June 15, 1962:

"Nor is it true that two houses based on population will be mirror images of each other. They will, rather, present different reflections or combinations of the various elements that make up the population. For one thing, one house will have more members than the other, representing smaller districts. The length of terms will differ. In addition, members of one house may be elected from single-member districts, while multi-member constituencies are used in the other house. And, not least, politicians are human beings whose differing personalities produce institutions of differing qualities.

"A number of states offer contemporary evidence that two houses based on population are by no means duplicates of one another. In Massachusetts both houses are apportioned on the basis of population; the two houses are among the most representative in the country. But the House has 240 members, the Senate 40, and even under control of the same party the two bodies man-

age to disagree often enough. In Washington and Oregon both houses are based on population; though less disparate in size than the Massachusetts chambers (there are about half as many senators as representatives), the two houses are quite different in political outlook."

Finally, the last resort of those seeking to justify legislative apportionment such as is involved here is that it is analogous to that of the Congress of the United States where election to the lower House is based on population and the United States Senate is composed of two Senators from each State regardless of the representative population of the States. My Brother Campbell has indicated that he is well aware of the atypical distinctions between the Federal Government and the individual States, and that he is not unmindful of the many cases which have rejected the "Federal analogy" holding that type of apportionment invidiously discriminatory and cites authorities with which I concur.

In addition to the cases heretofore cited, I refer again to "One Man—One Vote", supra, which succinctly refutes, in my opinion, the contentions here urged:

"A second major point on which the conferees were agreed is that the principle of apportionment on the basis of population is equally applicable in both houses of a state legislature. The fact that all voters have an equal voice in the choice of one house would be no reason to give some voters more weight than others in electing the second chamber.

"The arguments for basing representation in one state legislative chamber on something other than people are the familiar ones: principally, that the rural population has special interests requiring protection by disproportionate voting power. Two further arguments are made.

"*First*, it is pointed out that in Congress the House represents people and the Senate states. This is said to provide precedent and justification for a similar 'Federal plan' in the state legislature, with one house representing people and the other counties or some similar geographic unit. But the analogy is false. The United States was created by thirteen sovereign states, and the Constitution embodies a theory of federalism which divides sovereign power between the nation and the states. A key device for protecting their residual sovereignty was the equal state voice in the Senate. Thus the Senate was a condition of union among a group of states which the Federal Government created by that union has no power to destroy. Counties, [or senatorial districts], by contrast, were never independent or sovereign. They did not create the states but were created by them. They are wholly creatures of the states and may at any time be merged, divided or abolished by state governments.

(Bracketed material added.)

"Federalism as a political theory has had and continues to have value as a device of compromise permitting the joining of lesser sovereignties into greater unions; an example in process is the European Economic Community. But to speak of federalism within a state is to reduce a great principle to an absurdity. 'The United States Senate is both irrelevant and improper as a model for representation within a state.' Professor Paul David of the University of Virginia has written, because 'a state is not a federal union of sovereign counties.' Too often, the argument for a 'Federal plan' of representation in state legislatures is born of simple ignorance of its actual background and implications. At worst, it may be advanced as a disingenuous cover for the disenfranchisement of urban and suburban voters.

"*Second,* it is contended that a bicameral legislature would have no purpose if both houses were representative of population. This argument assumes two propositions: that the only function of bicameralism is to provide contrasting bases of representation in the two houses (i. e., one people and the other 'area'), and that making both houses representative of population would make the second house a mirror of the first and hence redundant. Neither proposition can be supported.

"The second house has a function quite apart from giving preferred political status to one population group—the function of providing checks and balances in the legislative process, of assuring more mature and deliberate consideration before a law is enacted. That was in fact the reasoning that underlay the adoption by many states during the nineteenth century of a population basis for both houses of their legislatures.

"Later in that century, and in this, factors other than population were often introduced, by constitutional amendment or by failure to reapportion. Those who held political power abandoned population representation in order to retain their control in the face of population changes that they saw coming. Such philosophical justifications as the so-called 'Federal plan' were designed to obscure the real motivation, just as today most of the elaborate arguments against representation on the basis of people are simply covers for a naked struggle to retain political power.

"The justification for bicameralism remains the provision of checks and balances. Bicameralism may also serve to further the very objective of representing the people equitably in a legislature. In any districting geographic features are bound to cause some inequalities of population among districts. When there are two houses, an area that is somewhat underrepresented in one may be given a compensating advantage in the other and minor inequities in apportionment thus be balanced off.

\* \* \* \* \* \*

"There is no justification for making one house of a state legislature reflect the will of all the voters and the other the will of particular regions or classes."

In addition, the Federal Advisory Commission on Intergovernmental Relations, a federal commission created by Congress for the purpose of conducting a continual study of federal, state and local governmental problems, recently completed an exhaustive study of the apportionment of state legislatures. This commission, composed of congressmen, governors, state legislators, county officials, city officials and public members, came to the following conclusion as to the proper basis for state legislative apportionment [Advisory Commission on Intergovernmental Relations, Apportionment of State Legislatures, pp. 67–73 (U. S. Govt. Printing Office, December 1962)]:

" *'Equal protection of the laws' would seem to presume, and considerations of political equity demand, that the apportionment of both houses in the State legislature, be based strictly on population.*

"The Fourteenth Amendment to the United States Constitution is an amendment designed for the protection of the people. It is not intended to protect political subdivisions, minority views, or any particular form of governmental structure. The Fourteenth Amendment is concerned with one thing, and one thing only— that each person be treated equally in the eyes of the law of each and every State.

"In applying the requirement that each person be treated equally in the

eyes of State law to the question of apportionment of seats in the State legislature, only one interpretation is possible. That interpretation requires that each man's vote must count the same as every other man's vote. The State has no authority to classify people according to where they live—urban or rural areas—the type of work they do—laborer or banker—the type of education they have had—high school or college graduate—and authorize such classes to elect representatives to the State legislature in such a manner as to permit the vote of the members of any such class to have more weight in the election of State legislators than the members of any other class. Therefore, the Commission believes that population is the only fair and acceptable method of apportioning seats in the State legislature.

\*    \*    \*    \*    \*    \*

"Except to the extent that they are represented according to their numbers and that they have an opportunity to present their views to that body, minorities are not entitled to protection in the State legislature. Protection of minority interests or views does not mean the minority should be in a position to veto the desires of the majority. The protection given minority views and interests should not be a veto power in the legislative process, since other adequate protections are offered by both Federal and State constitutions. \*  \*  \*."

In the light of the foregoing, I would hold that Article IV, Section 6 of the Constitution of Illinois and the implementing statutes, Ill.Rev.Stat.1961, Ch. 46 §§ 158–3 and 158–5, are invalid and void because they deprive and continue to deprive the Plaintiffs of liberty and property without due process of law and of the equal protection of the laws in violation of the Fourteenth Amendment of the Constitution of the United States.